**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**May 24, 2006**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

No. 05-70018

JOHNATHAN MOORE,

Petitioner-Appellant,

VERSUS

DOUG DRETKE, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Texas

(SA-02-CV-0579)

Before GARZA, DeMOSS, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Petitioner Johnathan Bryant Moore was convicted in Texas state court of capital murder and sentenced to death. After exhausting all available state remedies, Moore filed a petition for federal habeas corpus relief in the U.S. District Court for the Western District of Texas, claiming that he received ineffective assistance

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

of counsel in violation of the Sixth Amendment and that he was sentenced to death in violation of the Seventh Amendment. The district court denied the petition and declined to issue a certificate of appealability (COA). Moore now requests that this Court grant a COA as to his ineffective assistance of counsel claim pursuant to 28 U.S.C. § 2253(c)(2). For the reasons stated below, we deny Moore's Application for a Certificate of Appealability.

## I. Background

In October 1996, Petitioner Moore was convicted of capital murder for the shooting of San Antonio police officer Fabian Dominguez and sentenced to death. The facts of the murder, as summarized by the Texas Court of Criminal Appeals (TCCA) on direct appeal, are as follows:

> On January 15, 1995, at approximately 5:00 a.m., San Antonio police officer Fabian Dominguez went off duty and began driving home in his personal vehicle. Officer Dominguez lived in San Antonio with his wife and infant twin daughters. Officer Dominguez was a few blocks from home when he noticed suspicious activity at the residence of William Braden. Based on what Officer Dominguez observed, he took action to investigate what appeared to be a burglary in progress. When he pulled into the Braden driveway, blocking in the suspects' vehicle, Paul Cameron, Pete Dowdle, and [Moore] were concluding their second trip to burglarize the Braden home.
> In his voluntary written statement to Detective James Holguin, [Moore] described the sequence of events leading up to the murder of Officer Dominguez.
> > For some dumb reason we decided to go back to the house on Country Flower. We went in Pete's grandmother's car. . . . Pete drove. I was in the front passenger side of the car and Paul was in the backseat. Pete backed the car into the driveway. Pete stayed out in the car. We had accidently left the front door wide open the first time. Me and Paul went in through

2

the front door. We didn't have any problem with the dog. All three of us were wearing gloves again. We had left some guns and a compound bow were left (sic) from the first time. We got those things. Me and Paul decided to split form (sic) the inside. We walked outside and we saw a car passing by. The car stopped and I saw the reverse lights come on. We all got into the car. Pete was behind the wheel. I was in the front passenger seat and Paul was in the backseat. The car pulled into the driveway and pretty much blocked us in. The police officer got out of the car and had his gun pointing at Pete. I could see that this guy was wearing a police uniform. The officer said get out of the car now. I had my window rolled down. The officer kept repeating "get out of the car". . . . I kept telling Pete let's split but he would not do it. By the time the officer walked up to the car and had the gun pointed at my head. (sic) The officer was on the passenger side of Pete's car. The officer told Pete to give him the car keys and Pete gave it to him. I scooted the officer's pistol away and I pulled out my gun and shot at him. I believe I shot at him three times. The officer fell to the ground. I already had my gun in my hand when the officer walked up. My gun is a .25 caliber automatic. It's plated and it's a Lorcin brand. After I shot the officer his gun fell into the front rear seat of Pete's car. I got out of the car and I got the car keys and gave them to Pete. I got the officer's gun and shot the officer three times in the head. I got back in the car and Pete split. Paul was in the backseat during the whole time. Pete didn't want to get into trouble after I shot the cop so he drove away.

Neighbors across the street heard gunfire coming from the Braden home. Upon receiving a 911 call, police and emergency personnel were immediately dispatched. Officer Dominguez was dead by the time firemen arrived on the scene. The coroner later determined that Officer Dominguez died from multiple gunshot wounds to the head. Ballistics established that the wounds were inflicted by one shot from [Moore]'s .25 caliber handgun, and three shots from Officer Dominguez's .40 caliber service weapon.

3

After leaving the scene of the crime, [Moore], Cameron, Dowdle, and [Moore]'s girlfriend, Meredith Nichols, traveled to a plot of land near Pipe Creek, Texas, where they disposed of both murder weapons and the items stolen from the Braden residence.

The following day [Moore] was developed as a suspect in the burglary. He was subsequently located and seen driving a vehicle that belonged to Nichols. Nichols was a passenger in the vehicle. While under police surveillance, [Moore] committed numerous traffic violations. When police officers signaled him to pull to the side of the road, a high speed chase ensued. Twenty miles later, [Moore] and Nichols were captured after [Moore] careened to the side of the road. After a brief struggle, San Antonio police officers arrested [Moore] and took him into custody. In his voluntary statement to Detective Holguin [Moore] explained his flight from authorities, stating, "I figured pretty much that the cops knew that I was the one that shot the cop."

*Moore v. State*, 999 S.W.2d 385, 391-92 (Tex. Crim. App. 1999).

On direct appeal to the TCCA, Moore raised thirty-seven points of error. The TCCA found no error and affirmed his conviction and sentence. Moore's petition for writ of certiorari to the U.S. Supreme Court was denied. Moore subsequently filed an application with the Texas trial court for a writ of habeas corpus, raising eighteen grounds for habeas relief. After holding an evidentiary hearing, the convicting court entered findings of fact and conclusions of law recommending that Moore's application be denied. The TCCA adopted the convicting court's recommended factual findings and legal conclusions and denied Moore's request for habeas relief.

Moore subsequently filed a petition for a writ of habeas corpus in federal district court. In his petition, he raised only

4

two grounds for relief, both of which were previously raised before the state habeas court: (1) that he received ineffective assistance of counsel in violation of the Sixth Amendment; and (2) that he was sentenced to death in violation of the Seventh Amendment. The district court denied relief and declined to issue a COA. Moore thereafter filed an Application for a Certificate of Appealability with this Court. He only seeks a COA as to the ineffective assistance of counsel claim.

II. Facts Relating to Ineffective Assistance of Counsel Claim

Moore's central claim is that he received ineffective assistance of counsel at trial because his court-appointed attorneys failed to present sufficient available evidence--namely, the testimony of defense experts--to the trial judge to support their request that a jury be empaneled to determine whether Moore was competent to stand trial. The facts relevant to this claim are drawn from the pretrial proceedings, the guilt-innocence and punishment phases of trial, and the post-conviction proceedings.[2]

Pretrial, at a suppression hearing, Moore's court-appointed counsel, John Convery and Ronald Guyer, made an ex parte application to the trial court for an examination of Moore on his competency to stand trial. Counsel asked the court to consider, in deciding whether to hold a competency hearing, inappropriate

---

[2]We summarize the well-stated facts presented in the district court's order, *Moore v. Dretke*, No. SA-02-CA-0579 (W.D. Tex. Mar. 22, 2005), which reflect the state habeas court's findings of fact.

outbursts and comments made by Moore during the suppression hearing, Moore's history of mental illness, including hospitalization and treatment at a mental health facility, and counsel's general impression that Moore was not competent and did not understand the proceedings against him. The court found insufficient evidence to necessitate a competency hearing, but, "in an abundance of caution," appointed Dr. Michael Arambula to examine Moore and give the court an opinion as to Moore's competency.

Dr. Arambula examined Moore, but he never gave the trial court an opinion as to Moore's competency; rather, he and his colleague, Dr. Margot Zuelzer, who also examined Moore, made reports only to Moore's counsel. While equivocal, they both reported that they felt Moore was competent to stand trial. The only report on competency submitted to the trial court was one prepared by Dr. John Sparks, a psychiatrist appointed for the State to evaluate Moore's competency, sanity, and future dangerousness after Moore's counsel notified the court during voir dire of their intention to raise insanity as a defense. Dr. Sparks stated in his report that he thought Moore was competent to stand trial.

When trial commenced, Moore tried to discharge his attorneys, expressing concern about being represented by lawyers who were "paid for by the State." The trial court discussed the inadvisability of self-representation with Moore and gave him time to meet with his attorneys over lunch to reassess whether he wanted to discharge them. After lunch, Moore indicated that he would

proceed with Guyer and Convery as counsel. Moore's competency was not raised again at this time.

Moore's chief defense at trial was insanity. His counsel put Doctors Arambula and Zuelzer on the stand to testify as to Moore's mental state at the time of the offense. They both testified that Moore suffered from schizoaffective disorder and that his illness was severe, rendering him insane at the time he shot Officer Dominguez. Neither doctor was asked on the stand about Moore's competence to stand trial. The State called Dr. Sparks and another doctor--who evaluated detainees, including Moore, at the Bexar County Jail--on rebuttal, and they testified that Moore suffered from dysthymia, a minor depression, and possibly a borderline personality disorder and that his illness did not render him legally insane at the time of the shooting. Neither doctor called by the State was asked on the stand about Moore's competence to stand trial. At the conclusion of the guilt-innocence phase of the trial, the jury rejected Moore's insanity defense and found Moore guilty of capital murder.

At the punishment phase of trial, Moore again tried to discharge his attorneys. This time, Moore was not persuaded by the court's admonition regarding the advisability of self-representation; he insisted on representing himself. After inquiring into Moore's ability to choose intelligently and voluntarily to self-represent, the trial court warned Moore about the dangers of self-representation, noted that the record reflected

7

that he was mentally competent, and permitted him to proceed without counsel. Guyer and Convery, whom the court appointed as standby counsel in the event that Moore demonstrated an inability to represent himself, moved at this time for a competency hearing under Texas Code of Criminal Procedure article 46.02.[3] However, they did not present any new evidence regarding competence, relying instead on the insanity evidence presented at trial and Moore's insistence on representing himself. Denying Guyer and Convery's motion, the trial court emphasized that Dr. Sparks had filed a report with the court stating his opinion that Moore was competent to stand trial and that a desire to self-represent did not in and of itself suggest that Moore was incompetent. Later that day, Guyer and Convery renewed their request for a competency hearing. The trial court again denied their request, stating that it had heard no evidence suggesting that Moore was incompetent.[4]

Moore represented himself during the first two days of the punishment phase of trial, asking relevant questions and obtaining favorable rulings on objections. On the second day, Moore decided

---

[3]Article 46.02 provided at that time,
If during the trial evidence of the defendant's incompetency is brought to the attention of the court from any source, the court must conduct a hearing out of the presence of the jury to determine whether or not there is evidence to support a finding of incompetency to stand trial.
TEX. CODE CRIM. PROC. art. 46.02, § 2(b) (West 1996).

[4]The record shows that Guyer informed the trial court that "[counsel] might present Dr. Arambula on this matter," but after a brief recess advised the court that "[counsel is] not prepared to go forward on that at this moment."

8

to discontinue self-representation, and Guyer and Convery were reinstated as counsel. Counsel then moved for a mistrial, based in part on evidence of Moore's competency. The motion was denied. Counsel continued to represent Moore throughout the remainder of his trial. On October 25, 1996, Moore was sentenced to death.

On appeal to the TCCA, Moore's conviction and sentence were upheld. Addressing one of many points of error, the TCCA found that Moore was competent to stand trial and that the combination of Moore's courtroom outbursts, his mental health history, his self-representation, and nonspecific concerns about his ability to communicate with his attorneys did not raise a bona fide doubt as to his competency such that a competency hearing was warranted in the court below. The Supreme Court denied Moore's petition for writ of certiorari.

Finally, Moore filed an application for a writ of habeas corpus with the Texas trial court, arguing, in part, that he was convicted and sentenced while incompetent and that he received ineffective assistance of counsel. The court conducted an evidentiary hearing and took testimony from Moore's trial counsel and Doctors Arambula and Zuelzer regarding Moore's competency and the effectiveness of his counsel. Convery and Guyer testified that throughout trial, it became increasingly difficult to communicate with Moore. Convery testified that he suspected Moore was mentally ill from the first time he met him; Guyer similarly testified that he initially suspected Moore was mentally ill and had a difficult

9

time getting Moore to talk to him about the crime. The lawyers' testimony shows that they disagreed about when to bring evidence of Moore's incompetency to the attention of the court. Convery wanted to present competency as an issue right away, whereas Guyer wanted to delay bringing forward evidence of incompetency until after they presented Moore's insanity defense. However, Guyer testified that by the time of jury selection, Moore had begun to cooperate with his attorneys and they had enough information to proceed. Doctor Arambula testified that he found Moore competent to stand trial when he examined him in May 1996, but he noted that he was concerned Moore could decompensate and shared that concern with Moore's counsel. Dr. Arambula further testified that under a hypothetical situation in which Moore's paranoia and delusions caused him to become so suspicious of his attorneys that he refused to communicate with them, kept his head down, flipped through magazines and books during trial, and eventually chose to represent himself, he could have testified that Moore was incompetent. However, Dr. Arambula noted that he had only reached this conclusion just prior to the writ hearing. Dr. Zuelzer similarly testified that she was concerned about Moore's competence and that she communicated her concerns to Dr. Arambula, although not to Moore's attorneys. Dr. Zuelzer further testified that after hearing about Moore's conduct during trial, she felt he had become incompetent. The state habeas court recommended that the TCCA deny all claims for relief, concluding that Moore had failed to prove

10

that he was incompetent in fact and failed to establish either deficient performance or prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984). According to the court, Moore's counsel were not deficient in raising Moore's competency because the state writ hearing testimony of Moore's defense experts--which Moore claimed would have raised a bona fide doubt as to his competency--was not reasonably available to counsel during trial; moreover, their performance did not prejudice Moore's defense because he failed to establish that he was incompetent in fact. The TCCA adopted the state habeas court's findings of fact and conclusions of law and denied all claims for relief. Moore timely filed a petition for a writ of habeas corpus with the U.S. District Court for the Western District of Texas on December 31, 2002. That court also denied relief, finding that the TCCA's determination regarding Moore's ineffective assistance of counsel claim was not contrary to and did not involve an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d)(1) because his counsel's performance was not deficient and their performance was not prejudicial. The district court agreed that Moore's failure to establish that he was incompetent in fact decided the prejudice issue, citing *Carter v. Johnson*, 131 F.3d 452 (5th Cir. 1997). The district court concluded that Moore was not entitled to a COA because there was no basis for disagreement among jurists of reason regarding the court's disposition of the ineffective assistance of

11

counsel claim. Moore asks us to grant a COA and ultimately reverse the district court's denial of habeas relief.

## III. Discussion

Moore filed his federal petition for a writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA). Accordingly, his petition is subject to AEDPA's requirements. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under AEDPA, a petitioner must apply for and obtain a COA before appealing a district court's denial of habeas relief. 28 U.S.C. § 2253(c).

To obtain a COA, an applicant must make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003), and to meet this standard, the applicant must demonstrate that "'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further,"'" *Miller-El*, 537 U.S. at 336 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). We recognize that the inquiry in which this Court must engage "is a threshold inquiry only, and does not require full consideration of the factual and legal bases of [the petitioner's] claim[s]." *Neville v. Dretke*, 423 F.3d 474, 482 (5th Cir. 2005) (citing *Miller-El*, 537 U.S. at 336). We will issue a COA if Moore can demonstrate that "the [d]istrict [c]ourt's application

12

of AEDPA to [his] constitutional claims . . . was debatable among jurists of reason." *Miller-El*, 537 U.S. at 336. A claim can be debatable "even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. Because Moore was sentenced to death, "we must resolve any doubts as to whether a COA should issue in his favor." *Martinez v. Dretke*, 404 F.3d 878, 884 (5th Cir. 2005).

In evaluating the district court's application of AEDPA to Moore's constitutional claims, we keep in mind the standard of review imposed by AEDPA on the district court. First,

> A district court may grant habeas relief only if it determines that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Leal v. Dretke*, 428 F.3d 543, 548 (5th Cir. 2005) (quoting 28 U.S.C. § 2254(d)(1), (2)). Second, "a determination of a factual issue made by [the] State court shall be presumed to be correct" unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Moore argues that he is entitled to a COA, and ultimately habeas relief, because (1) his conviction and sentence offend the Assistance of Counsel Clause of the Sixth Amendment in that his trial attorneys failed to present sufficient available evidence of

13

his incompetence to the trial court to support their request for a competency hearing, (2) the courts of Texas were unreasonable to hold that the state writ hearing testimony of Moore's defense experts, which Moore argues would have raised a bona fide doubt as to his competency to stand trial, was not reasonably available to Moore's attorneys during trial, and (3) the courts of Texas unreasonably applied the wrong rule of decision in holding that Moore was not prejudiced by the failure of his defense attorneys to produce during trial the testimony of defense experts on the question of his competency to stand trial.[5] Respondent Dretke contends that Moore's second and third arguments are attacks on the TCCA's analysis of the ineffective assistance of counsel claim and that as such, they are not reviewable. *See Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) ("[A] federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision."). While we recognize that we cannot second guess a state court's decision just because its reasoning is wrong, we do not face such a problem here because we agree with the state court's resolution of the prejudice issue and find that reasonable jurists

---

[5]The TCCA held that Moore failed to establish prejudice because he failed to establish at the writ hearing that he was incompetent to stand trial, citing *Edwards v. State*, 993 S.W.2d 171 (Tex. App.--El Paso 1999, pet. ref'd), *Brown v. State*, 960 S.W.2d 772 (Tex. App.--Dallas 1997, pet. ref'd), and *Taylor v. State*, 948 S.W.2d 827 (Tex. App.--San Antonio 1997, pet. ref'd).

14

could not debate the district court's conclusion as to the same.

A criminal defendant has a right to counsel under the Sixth Amendment, and the right to counsel entails the right to effective assistance of counsel. *Strickland*, 466 U.S. at 684-86. To prove ineffective assistance of counsel under *Strickland*, a defendant must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Id.* at 687. A finding of deficient performance requires a showing that "'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment,'" *Leal*, 428 F.3d at 548 (quoting *Strickland*, 466 U.S. at 687), that is, petitioner must show that counsel's performance fell below an objective standard of reasonableness, as measured by prevailing professional norms, *Strickland*, 466 U.S. at 688. Deficient performance is prejudicial "only if, but for counsel's errors, there is a reasonable probability that the final result would have been different and confidence in the reliability of the verdict has been undermined." *Leal*, 428 F.3d at 548 (citing *Little v. Johnson*, 162 F.3d 855, 860-61 (5th Cir. 1998)). Failure to prove either deficient performance or prejudice will defeat an ineffective assistance of counsel claim, *id.*, and if a case can be decided on the prejudice prong, it should be, *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990) ("The central purpose in examining any claim of ineffective assistance of counsel is to ensure that the

15

defendant was accorded due process, 'not to grade counsel's performance.'" (quoting *Strickland*, 466 U.S. at 697)).

Because we find that the prejudice prong decides this case, we do not address the reasonableness of counsel's performance. Reasonable jurists could not debate the district court's conclusion that counsel's performance in this case was not prejudicial. The TCCA found that Moore failed to establish that he was incompetent to stand trial--considering all the evidence brought forward in the state writ hearing, including the defense experts' testimony--and this factual finding is entitled to a presumption of correctness. *See Thompson v. Keohane*, 516 U.S. 99, 111 (1995) (noting competency to stand trial is a "factual issue," the resolution of which is entitled "presumptive weight" (citing *Maggio v. Fulford*, 462 U.S. 111, 117 (1983))); *Demosthenes v. Baal*, 495 U.S. 731, 735 (1990) (same); *Carter*, 131 F.3d at 464 (holding that the state habeas court's decision regarding competency was entitled to a presumption of correctness). Moore has failed to rebut this presumption with clear and convincing evidence. Therefore, "it necessarily follows that [Moore's] trial counsel were not constitutionally ineffective." *Carter*, 131 F.3d at 464.

Moore argues that *Bouchillon v. Collins* necessitates a different result because there the Court held that a petitioner "need only demonstrate a 'reasonable probability' that he was incompetent"; he need not prove incompetence by a preponderance of

the evidence. 907 F.2d at 595. However, *Bouchillon* and the instant case are distinguishable because here we are bound by the state court's factual determination that Moore is competent, whereas there was no such binding factual determination in *Bouchillon*. *Id.* at 593-94. Furthermore, *Bouchillon* stands for the proposition that a defendant can show prejudice by demonstrating a reasonable probability that the state court would have found the defendant to be incompetent, had the attorney not performed ineffectively. *See Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability to undermine confidence in the outcome."). Here, because we must presume the correctness of the state court determination that Moore was, in fact, competent to stand trial, Moore has not met this standard.

## IV. Conclusion

Petitioner Moore has not demonstrated that reasonable jurists could debate the district court's conclusion that Moore did not receive ineffective assistance of counsel. Accordingly, Moore's Application for a Certificate of Appealability is DENIED.