United States Court of Appeals
Fifth Circuit

**F I L E D**

April 11, 2007

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
for the Fifth Circuit**

No. 05-70057

ARTURO DIAZ,

Petitioner-Appellant,

VERSUS

NATHANIEL QUARTERMAN, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

Appeal from the United States District Court
for the Southern District of Texas
(7:04-CV-00225)

Before JONES, Chief Judge, and WIENER and DeMOSS, Circuit Judges.

PER CURIAM:[*]

Petitioner Arturo Diaz was convicted in Texas state court of capital murder and sentenced to death. He comes before this Court to request a Certificate of Appealability ("COA") to appeal the district court's denial of federal habeas relief. For the reasons stated below, we grant Diaz's request in part and deny it in part.

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## I. Background

In February 2000, Diaz was convicted in Texas state court of the capital murder of Michael Ryan Nichols. He was sentenced to death. The facts stated below are taken from the opinion of the Texas Court of Criminal Appeals ("TCCA") on direct appeal and the report and recommendation of the magistrate judge as adopted by the district court on federal habeas review.

On April 1, 1999, Nichols was in McAllen, Texas on business. That night, the night before he was murdered, Nichols went out with an exotic dancer named Danielle Thomas who performed exotic dances at parties and private dances. While they were out, a teller machine destroyed Nichols' bank card and Thomas loaned him $100. When the nightclubs closed at 2:00 a.m., Nichols and Thomas returned to Thomas' trailer, where they met up with Diaz and a woman named Arcelia Reyes. The four watched movies until 4:00 or 5:00 a.m., when Thomas and Reyes, who provided security for Thomas, borrowed Nichols' truck to go to a motel so Thomas could dance. Reyes returned the truck to Nichols before the dance ended. Thomas called the trailer several times during the day, speaking sometimes to Diaz and sometimes to Nichols. When Thomas and Reyes returned to the trailer at 8:00 p.m. on April 2, the two men had left.

John Shepherd, a coworker of Nichols who shared a company-owned apartment in McAllen with him, later testified that Nichols, Diaz, and a man named Joe Cordova arrived at the McAllen apartment between 6:00 and 7:00 p.m. on April 2. Shepherd felt

2

uncomfortable around Nichols' companions. He noticed that Diaz had tattoos on his forearms. Shepherd left to buy beer and cigarettes. When he returned, he noticed that Nichols' truck was in the center of the parking lot, a fact that would become important later. Nichols, Diaz, and Cordova were watching television in the living room. Shepherd went to bed.

While Shepherd was in bed, Thomas and Reyes stopped by the apartment. Thomas testified that she had come to recover the $100 she had lent to Nichols on April 1. She saw that Nichols had two fifty dollar bills in his wallet. He gave her one and kept the other. After the murder, the second fifty dollar bill was not found in Nichols' wallet, or anywhere else for that matter. Instead, a piece of paper with Diaz's telephone number and first name were found in Nichols' wallet.

Later that night, Shepherd was awakened by a loud noise. He went to the living room and found Nichols bleeding from a wound in his arm. Diaz was holding a large butcher knife. After Shepherd asked three times "What's going on?," Nichols said, "Do what he says, get the money and they'll leave." Cordova said some things in Spanish and in English about Shepherd getting money; and Diaz spoke angrily in Spanish. Diaz then grabbed Shepherd's shirt and pushed him down the hall to his room. Shepherd got some cash from his pants pocket and gave it to Diaz. Diaz checked the pants for more money, then grabbed Shepherd's shirt and led him back to the living room. Cordova told Shepherd to sit on the couch and do what he was

3

told. Diaz and Cordova subsequently put Nichols on the floor and bound and gagged him with shoelaces and strips of bedding.

The phone rang, and Cordova answered it. Shepherd later testified that Cordova told the caller to "'come to get us, or come over here,' something like that . . . . Pretty quick there was a knock on the door." Thomas testified that Reyes had received a phone call around midnight and that she had borrowed Thomas' car and left for about forty-five minutes. Consistent with Thomas' testimony, Shepherd testified that a large Hispanic woman arrived at the apartment shortly after the phone call. The woman asked Cordova and Diaz what was going on, and Cordova told her something in Spanish. Shepherd testified that the woman did not look happy with Cordova's response. Cordova told the woman to face the door, and he told Shepherd not to look at her.

Diaz and Cordova beat Nichols. They put Shepherd on the floor and bound and gagged him, then returned their attention to Nichols. Cordova lifted Nichols up and held him while Diaz stabbed Nichols in the torso numerous times. An autopsy revealed perforations of Nichols' liver, kidney, lungs, and heart. A knife thrust had fractured a rib and broken off the tip of the knife, which remained in the rib. The autopsy also revealed lacerations to Nichols' scalp, neck, and flanks.

When Cordova noticed that Shepherd had freed one of his hands, he and Diaz beat Shepherd and stabbed him. Shepherd pretended to be dead and lost consciousness.

Diaz and a man known to Thomas as "Danny" arrived at Thomas' trailer at 3:00 a.m. on April 3. They were very nervous and in a hurry to leave. When Reyes returned, Thomas noted that she was very upset.

When Shepherd awoke, the apartment was dark. The evidence indicates that it was between 3:00 and 4:00 a.m. Shepherd freed himself from his bindings and left the apartment. He noticed Nichols' truck at the apartment gate with the driver's door open. At Shepherd's request, a neighbor called the police.

When the police arrived at the apartment complex, they found the gate locked and Nichols' truck parked next to the keypad box inside the gate. There was blood in the truck, bedding material on the ground, and a footprint on top of the keypad box that was later found to match Diaz's shoe. Nichols was found dead in the apartment; a beer bottle with Diaz's DNA on it was found on the floor next to him.

A man named Manuel Montes later testified that Cordova phoned him at about 4:00 a.m. on April 3 and asked Montes to pick him up from another neighborhood. Cordova was Montes' neighbor and the older brother of Montes' best friend. Montes picked up Cordova, Diaz, and a large woman and took them over to his house. Cordova had a bloody shirt wrapped around his arm, and when he was arrested, wounds were discovered on his arms and thigh.

After daylight, Cordova borrowed a pair of Montes' pants so that he could go home and get pants for himself and Diaz. After

Cordova and Diaz changed clothes, Cordova told Montes he would take care of the trash bag, which presumably contained the dirty clothes. Police later found a trash bag of clothing in Montes' home; the clothing was stained with Cordova's and Nichols' blood.

Montes also testified that he overheard Diaz telling some other men, in Cordova's presence, about a murder. According to this testimony, Cordova held the man, and Diaz stabbed him.

The defense presented no witnesses during the guilt-innocence phase of trial. Instead, counsel argued that Diaz was not guilty of capital murder because the State had failed to prove that the murder occurred during the commission or attempted commission of a robbery. The jury found Diaz guilty of the capital murder of Nichols. They also found him guilty of the attempted capital murder of Shepherd and of aggravated robbery.

During the penalty phase of trial, the State presented evidence that Diaz had engaged in misconduct while in the county jail; that his misconduct included fighting and refusing to go to court; that deputies had caught Diaz trying to dig a hole through the wall of his cell; that Diaz was housed in a unit used to hold members of the Pistoleros gang; and that Diaz had committed other assaults and homicides. Dr. John Edward Pinkerman, a psychologist, testified for Diaz. Prior to testifying, Dr. Pinkerman met with Diaz twice to conduct a psychological evaluation. He documented his findings in a written report. According to Dr. Pinkerman, Diaz's past medical history included head trauma from being knocked

6

unconscious during fights and a head injury suffered in a car accident. Dr. Pinkerman indicated that Diaz's history of head trauma could impair his ability to control and regulate his judgment and perceive reality; that Diaz has low-average intelligence and the verbal ability of an eleven-year old; that Diaz is prone to feeling guilty and might act out to incur punishment; and that Diaz has a history of antisocial behavior as a child that correlates with a high probability of adult criminal behavior.

Over defense's objection, the State introduced Dr. Pinkerman's written report into evidence. The report included Dr. Pinkerman's conclusion that Diaz "approached the assessment in somewhat of an exaggerated manner which may reflect an inability to cooperate with the testing or malingering in an attempt to present himself with the false claim of mental illness"; that Diaz was not mentally ill; and that Diaz's profile matches that of Type C offenders, which Dr. Pinkerman described as the most difficult criminal offenders -- those who are distrustful, cold, irresponsible, and unstable. Also, on cross, Dr. Pinkerman testified that Diaz had refused to discuss the facts of the offense with him on the advice of Diaz's attorney. After Dr. Pinkerman testified, the defense called no other witnesses.

During closing arguments, the defense reiterated its earlier argument, advanced during the guilt-innocence phase of trial, that Diaz was not guilty of capital murder because the evidence did not

show that the murder occurred during the commission or attempted commission of a robbery. The prosecutor, in turn, urged the jury that Diaz was not like them and that they had "a duty to protect the people of [the] county." The jury found that there was a probability that Diaz would commit criminal acts of violence that would constitute a continuing threat to society; that Diaz actually killed or intended to kill Nichols, or anticipated that human life would be taken; and that there was not sufficient mitigating evidence to justify the imposition of a life sentence instead of death. The trial court accordingly sentenced Diaz to death on the capital murder charge. It sentenced Diaz to life in prison on the attempted capital murder and aggravated robbery charges.

The Texas Court of Criminal Appeals affirmed Diaz's conviction and sentence and later denied Diaz's application for state habeas relief. On June 16, 2004, Diaz filed a federal habeas petition in the U.S. District Court for the Southern District of Texas. He made four claims:

> (1) that trial counsel rendered ineffective assistance with respect to the guilt-innocence phase of trial by failing to adequately investigate the State's case and fully discuss it with Diaz to ensure his plea of not guilty was knowing and voluntary;
>
> (2) that trial counsel rendered ineffective assistance with respect to the punishment phase of trial by (a) failing to adequately investigate and present readily available mitigating evidence, (b) failing to prepare the only witness offered, and (c) devoting almost their entire closing argument to a defensive theory that the jury had rejected during the guilt-innocence phase of trial;

8

(3) that the trial court deprived Diaz of a fair trial by admitting evidence of gang membership; and

(4) that the prosecutor infringed on Diaz's right to remain silent by eliciting testimony that Diaz had refused to discuss the offense with his own mental health expert.

On December 10, 2004, Diaz amended his petition with the State's permission. He added two new claims:

(5) that trial counsel rendered ineffective assistance during voir dire by failing to object to the exclusion of venire member Gerald Albrecht, and

(6) that appellate counsel rendered ineffective assistance by not appealing the prosecutor's closing statements that alluded to community expectations.

The State moved for summary judgment. The magistrate judge filed a report and recommendation recommending that the court grant the State's motion for summary judgment, dismiss Diaz's habeas petition with prejudice, and deny Diaz a COA. Specifically, the magistrate found that Diaz's first claim and the last two parts of his second claim were unexhausted and therefore procedurally barred. Further, the magistrate found that Diaz's fifth and sixth claims were added to his habeas petition after the limitations period had expired; however, she ultimately recommended denial on the merits after determining that both claims were subject to equitable tolling. Finally, the magistrate concluded that Diaz was not entitled to relief on the exhausted portion of his second claim or on his third or fourth claims. The court adopted the magistrate judge's report and recommendation, dismissed Diaz's petition with prejudice, and stated that a COA would not issue. Diaz requests a COA from this

Court.

## II. Discussion

Diaz filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA). Accordingly, his petition is subject to AEDPA's requirements. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under AEDPA, a petitioner must apply for and obtain a COA before appealing a district court's denial of habeas relief. 28 U.S.C. § 2253(c); *see also Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The district court denied Diaz's request for a COA; therefore, his only alternative is to obtain a COA from this Court. 28 U.S.C. § 2253(c); *see also Coleman v. Quarterman*, 456 F.3d 537, 541 (5th Cir. 2006).

To obtain a COA, an applicant must make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2); *Miller-El*, 537 U.S. at 336, and to meet this standard, the applicant must demonstrate that "'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further,"'" *Miller-El*, 537 U.S. at 336 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 894 n.4 (1983))). We recognize that the inquiry in which this Court must engage "is a threshold inquiry only, and does not require full consideration of the factual and legal bases of [the petitioner's]

10

claim[s]." *Neville v. Dretke*, 423 F.3d 474, 482 (5th Cir. 2005) (citing *Miller-El*, 537 U.S. at 336). We will issue a COA if Diaz can demonstrate that "the [d]istrict [c]ourt's application of AEDPA to [his] constitutional claims . . . was debatable among jurists of reason." *Miller-El*, 537 U.S. at 336. A claim can be debatable "even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. Because Diaz was sentenced to death, "we must resolve any doubts as to whether a COA should issue in his favor." *Martinez v. Dretke*, 404 F.3d 878, 884 (5th Cir. 2005).

In evaluating the district court's application of AEDPA to Diaz's claims, we keep in mind the standard of review imposed by AEDPA on the district court. First,

> A district court may grant habeas relief only if it determines that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Leal v. Dretke*, 428 F.3d 543, 548 (5th Cir. 2005) (quoting 28 U.S.C. § 2254(d)(1), (2)). Second, "a determination of a factual issue made by [the] State court shall be presumed to be correct" unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Diaz requests a COA on seven issues: (1) whether the

11

ineffective assistance of state habeas counsel is sufficient cause to warrant review of a procedurally barred claim; (2) whether trial counsel rendered ineffective assistance with respect to the guilt-innocence phase of trial by failing to adequately investigate the State's case and fully discuss it with Diaz to ensure his plea of not guilty was knowing and voluntary; (3) whether trial counsel rendered ineffective assistance with respect to the punishment phase of trial by (a) failing to adequately investigate and present readily available mitigating evidence, (b) failing to prepare the only witness offered, and (c) devoting almost their entire closing argument to a defensive theory that the jury had rejected during the guilt-innocence phase of trial; (4) whether the trial court deprived Diaz of a fair trial by admitting evidence of gang membership; (5) whether the prosecutor infringed on Diaz's right to remain silent by eliciting testimony that Diaz had refused to discuss the offense with his own mental health expert; (6) whether trial counsel rendered ineffective assistance during voir dire by failing to object to the exclusion of venire member Gerald Albrecht; and (7) whether appellate counsel rendered ineffective assistance by not appealing the prosecutor's closing statements that alluded to community expectations.

As an initial housekeeping matter, we note that Issue 1 -- whether the ineffective assistance of state habeas counsel is sufficient cause to warrant review of a procedurally barred claim -- does not embody a separate ground for relief, that is, "it is

12

not an issue that raises 'a substantial showing of the denial of a constitutional right.'" *Busby v. Dretke*, 359 F.3d 708, 713 n.3 (5th Cir. 2004) (quoting 28 U.S.C. § 2253(c)(2)). Rather, it is an issue that Diaz raises only to promote review of his procedurally barred claims. Accordingly, we will address it only to the extent that it impacts those claims.[1]

Further, based on our limited, threshold inquiry and general assessment of the merits of the remaining issues, we conclude that Issue 3(a) presents an issue that is adequate to deserve encouragement to proceed further, that is, whether trial counsel rendered ineffective assistance with respect to the punishment phase of trial by failing to adequately investigate and present readily available mitigating evidence. Accordingly, we grant a COA as to this issue. If Diaz wishes to file a supplemental brief with respect to the merits of this issue, he may do so within thirty days of the date of this order. The supplemental brief should only address matters that have not already been covered in the brief in support of the COA application. The State may file a response fifteen days thereafter.

We now proceed to address the remaining issues in turn, grouping like issues for readability.

---

[1]The Government contends that we should not address this issue at all because it was not raised before the district court; however, the record shows that Diaz argued ineffective assistance as cause for default in his response to the Government's motion for summary judgment.

13

## A. Ineffective Assistance of Counsel

Diaz presents five ineffective assistance of counsel claims (Issues 2, 3(b), 3(c), 6, and 7). The district court, in adopting the magistrate's report and recommendation, ruled that Issues 2, 3(b), and 3(c) were unexhausted and therefore procedurally barred. Finding no cause for the procedural default, the court did not address their merits. The court then addressed the merits of Issues 6 and 7 and found that neither provided grounds for habeas relief. Diaz finds error with the district court's procedural rulings and with its conclusion that he is not entitled to relief with respect to Issues 6 or 7.

We review procedural rulings resulting in the denial of habeas relief under the standard set forth in *Slack v. McDaniel*, 529 U.S. 473 (2000):

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

529 U.S. at 484. With respect to Issue 2, we find that reasonable jurists could not debate the district court's procedural ruling, and we decline to issue a COA as to that claim. We do not consider the district court's procedural ruling as to Issues 3(b) and (c), however, because we find that reasonable jurists could not debate whether they state a valid claim of the denial of a constitutional

14

right. We address Issue 2 first and then address Issues 3(b) and (c) alongside the remaining ineffective assistance claims.

1.

Under AEDPA, a petitioner must exhaust his claims in state court before presenting them to a federal court for review. *See* 28 U.S.C. § 2254(b)(1)(A). To exhaust his claims, a petitioner must "fairly present" their substance to the state court. *Ruiz v. Quarterman*, 460 F.3d 638, 643 (5th Cir. 2006) (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971)). If the court to which the petitioner would be required to present his unexhausted claims would now find the claims procedurally barred, the petitioner has procedurally defaulted his claims and we are barred from reviewing them. *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). The failure to exhaust may be excused if the petitioner can demonstrate cause for the default and actual prejudice, or that application of the procedural bar would result in a "fundamental miscarriage of justice." *Id.* (citing *Coleman*, 501 U.S. at 750).

Diaz concedes that he failed to exhaust Issue 2. However, he argues that state habeas counsel were responsible for this failure and that the ineffective assistance of state habeas counsel can constitute cause for procedural default. The district court did not address whether the ineffective assistance of state habeas counsel can constitute cause for procedural default. However, the law is settled that it cannot. *See Elizalde v. Dretke*, 362 F.3d 323, 328-

15

30 (5th Cir. 2004). A defendant does not have a constitutional right to the assistance of counsel in state habeas proceedings, so he cannot blame state habeas counsel for any procedural default that occurs therein. *See id.* Because Diaz has offered no other cause for his default nor attempted to demonstrate that application of the procedural bar would result in a fundamental miscarriage of justice, reasonable jurists could not debate the district court's ruling that Issue 2, which was concededly unexhausted, was not subject to review.[2]

2.

Moving on to the merits of Issues 3(b), 3(c), 6, and 7,[3] we start by setting out the applicable law: A criminal defendant has a right to counsel under the Sixth Amendment, and the right to counsel entails the right to effective assistance of counsel.

---

[2] Diaz attempts for the first time here to make a new argument that incompetent, as opposed to ineffective, state habeas counsel can be held responsible for procedural default because Texas promises a defendant competent counsel. He did not make this argument before the district court, and we will not consider it here. *See Roberts v. Cockrell*, 319 F.3d 690, 695 (5th Cir. 2003).

[3] The State contends that a COA should not issue as to either Issue 6 or Issue 7 because both were added to Diaz's habeas petition after the statute of limitations had run. The district court, in adopting the magistrate's report and recommendation, ruled that Diaz was entitled to equitable tolling as to both claims because at the time Diaz's original petition was filed, the State consented to Diaz filing an amended petition outside the limitations period. We find no fault with the court's decision not to apply the limitations bar to Issues 6 and 7; however, we note that waiver is the more appropriate justification for the court's decision in this situation.

16

*Strickland v. Washington*, 466 U.S. 668, 684-86 (1984). To prove ineffective assistance of counsel under *Strickland*, a defendant must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Id.* at 687. A finding of deficient performance requires a showing that "'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment,'" *Leal*, 428 F.3d at 548 (quoting *Strickland*, 466 U.S. at 687), that is, petitioner must show that counsel's performance fell below an objective standard of reasonableness, as measured by prevailing professional norms, *Strickland*, 466 U.S. at 688. Deficient performance is prejudicial "only if, but for counsel's errors, there is a reasonable probability that the final result would have been different and confidence in the reliability of the verdict has been undermined." *Leal*, 428 F.3d at 548 (citing *Little v. Johnson*, 162 F.3d 855, 860-61 (5th Cir. 1998)). Failure to prove either deficient performance or prejudice will defeat an ineffective assistance of counsel claim. *Id.*

Diaz claims that his trial counsel rendered ineffective assistance with respect to the punishment phase of trial by failing to prepare the only witness offered and by devoting almost their entire closing argument to a defensive theory that the jury had rejected during the guilt-innocence phase of trial. The trial court did not reach the merits of these claims because it determined they

17

were procedurally barred; however, it is clear to us that reasonable jurists could not debate whether Diaz stated a valid claim of the denial of a constitutional right as to either. As Diaz's brief establishes, his complaints about counsel's witness preparation and closing arguments are based on his underlying complaint that counsel did not adequately investigate or present available mitigating evidence. He contends that if counsel had properly prepared defense witness Dr. Pinkerman, they would have realized that they needed to investigate and present other mitigating evidence. Diaz also contends that counsel failed by relying solely on a rejected defensive theory during closing instead of presenting mitigating evidence. Assuming, arguendo, that counsel's decision not to further investigate or present available mitigating evidence was reasonable,[4] then failing to prepare Dr. Pinkerman and failing to address any mitigating evidence in closing cannot have been constitutionally flawed. Diaz has provided no additional ground for finding the witness preparation or closing argument to be constitutionally deficient, and therefore the district court's ruling is not debatable among reasonable jurists.

Diaz also claims that his trial counsel rendered ineffective assistance during voir dire by failing to object to the exclusion of venire member Gerald Albrecht. Albrecht was excluded from the

[4]We make this assumption because the reasonableness of counsel's decision not to further investigate or present mitigating evidence is the subject of another claim, with respect to which we have granted Diaz a COA.

18

jury panel after he stated that his religious beliefs would cause him to "lean against the death penalty" and that he could not "set [his] religious beliefs aside" to decide a case solely on the evidence without regard to his beliefs. The State moved for his exclusion for cause, and defense counsel joined its motion.

Reasonable jurists could not debate the district court's conclusion that trial counsel's performance during voir dire was not ineffective. While a juror generally may not be challenged for cause based on his views about capital punishment, a juror whose views would prevent or substantially impair the performance of his duties as a juror may be. *Adams v. Texas*, 448 U.S. 38, 45 (1980). The Supreme Court has stated,

> The state of this case law leaves trial courts with the difficult task of distinguishing between prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial.

*Wainwright v. Witt*, 469 U.S. 412, 421 (1985). Although Albrecht may have equivocated about his position on capital punishment, as Diaz contends, he ultimately said that his religious beliefs would cause him to lean against the death penalty and that he would not be able to set aside those beliefs to render a decision based on the evidence. For all intents and purposes, Albrecht stated that he would not be able to apply the law or view the facts impartially because of his religious beliefs. In light of these remarks, it was

19

not error for the trial court to dismiss Albrecht for cause and considering there was no error to preserve, it was not unreasonable for Diaz's counsel not to object to a motion to exclude Albrecht. Accordingly, reasonable jurists could not debate the district court's conclusion that trial counsel's performance was not ineffective.

Finally, Diaz claims that his appellate counsel rendered ineffective assistance by not appealing the prosecutor's closing statements that alluded to community expectations. During closing, the prosecutor told the jury members that they were there "as a duty to the community. You are acting as public servants to this community." The prosecutor argued that Diaz "is not like you. You have a duty to protect the people of this county." Defense counsel objected to the prosecutor's statements and the trial court instructed the jury to disregard them; however, the court denied counsel's motion for a mistrial. Appellate counsel did not appeal this decision.

Reasonable jurists could not debate the district court's conclusion that appellate counsel's performance was not ineffective. The Supreme Court has recognized that one of appellate counsel's core duties is to distinguish weak claims from strong claims and focus the court's attention only on the strong claims on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751–52 (1983) ("Experienced advocates since time beyond memory have emphasized

20

the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). In that vein, the Supreme Court has held that "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Further, the Court has indicated that although "it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, . . . it is difficult to demonstrate that counsel was incompetent." *Id.* "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Id.* (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). In Diaz's case, appellate counsel argued on appeal that the evidence was insufficient to support a conviction for capital murder; that the trial court had erroneously admitted hearsay evidence; that the trial court had erroneously admitted a note found in Diaz's apartment, evidence of Diaz's tattoos, and evidence of gang membership; that trial counsel were ineffective; and that the evidence was insufficient to support a death sentence. We cannot say that the claim regarding the prosecutor's closing arguments was clearly stronger than any of the claims raised by appellate counsel. In fact, we think it was considerably weaker considering that the trial court instructed the jury to disregard

21

the offending comments. Accordingly, reasonable jurists could not debate the district court's conclusion that appellate counsel's performance was not ineffective. A COA will not issue as to Issues 3(b), 3(c), 6, or 7.

## B. Evidence of Gang Membership

Diaz argues that the trial court deprived him of a fair trial by admitting evidence of gang membership. The district court, in adopting the magistrate's report and recommendation, ruled that Diaz's First Amendment rights were violated by the admission of such evidence. However, it ultimately denied relief after finding that the trial court's error was harmless. We must determine whether reasonable jurists could debate this determination.

To obtain federal habeas relief based on non-structural constitutional error, a petitioner must show not only that constitutional error occurred, but also that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). As the magistrate explained,

> the jury had substantial evidence of Diaz'[s] violent nature and his history of criminal violence, including violence while in jail, completely apart from any evidence of gang membership. In view of the particularly violent nature of the Nichols murder and the evidence of Diaz'[s] other acts of violence and misconduct, the evidence of Diaz'[s] gang membership did not have "a substantial and injurious effect or influence in determining the jury's verdict."

22

*Diaz v. Dretke*, No. M-04-225 (S.D. Tex. 2005) (magistrate judge's report and recommendation). Having reviewed the evidence presented to the jury concerning Diaz's criminal history and history of violence, we are persuaded that reasonable jurists could not debate that the trial court's admission of evidence of gang membership was harmless. The jury had ample evidence of a history of crime and violence such that any mention of gang membership was harmless. A COA will not issue as to this claim.

## C. Right to Remain Silent

Diaz argues that the prosecutor infringed on his right to remain silent by eliciting testimony that he had refused to discuss his offense with his own mental health expert. The record shows that on cross-examination, the prosecutor and Dr. Pinkerman, Diaz's mental health expert, had the following exchange:

> Q. Did you talk to [Diaz] about the facts of his current incarceration?
>
> A. No, I did not.
>
> Q. [Diaz] told you that he didn't want to talk about that; is that correct?
>
> A. That's correct.
>
> Q. He told you that he had been advised by his attorneys not to talk about the facts of his current incarceration; is that right?
>
> A. That's correct.

The prosecutor made no other comment about Diaz's choice not to discuss his offense with Dr. Pinkerman. The district court, in

23

adopting the magistrate's report and recommendation, ruled that Diaz's Fifth Amendment right to remain silent was not violated by this discourse.

Reasonable jurists could not debate the district court's determination. Under the Fifth Amendment, a criminal defendant has a right to remain silent post-arrest. *Miranda v. Arizona*, 384 U.S. 436 (1966). At trial, a prosecutor may not comment on the defendant's choice to exercise that right. *See, e.g.*, *Doyle v. Ohio*, 426 U.S. 610, 617-18 (1976). Here, the prosecutor did not comment on Diaz's silence in a way that violated his constitutional rights. "The test for determining if a constitutional violation has occurred is whether 'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *United States v. Wharton*, 320 F.3d 526, 538 (5th Cir. 2003) (quoting *United States v. Rocha*, 916 F.2d 219, 232 (5th Cir. 1990)). A prosecutor's intent "is not manifestly impermissible if there is some other, equally plausible explanation for [his] remark," and "the question is not whether the jury might or probably would view the challenged remark [as a comment on silence], but whether it necessarily would have done so." *Barrientes v. Johnson*, 221 F.3d 741, 780 (5th Cir. 2000). When the above discourse is viewed in context, as the law requires, *see Wharton*, 320 F.3d at 538, it becomes apparent that the prosecutor

24

was likely trying to comment on the expert's lack of familiarity with Diaz's mental condition, not on Diaz's silence. Dr. Pinkerman had indicated in his written report that Diaz was experiencing "mild to moderate anxiety, depression and feelings of guilt" associated with his current incarceration. (Trial Tr. vol. 37, 155-56, Feb. 15, 2000.) By questioning Dr. Pinkerman about what Diaz had told him about his current incarceration, the prosecutor was likely seeking to prove that Dr. Pinkerman did not know if Diaz was experiencing anxiety and depression because of what he had done or because he was in jail. (Trial Tr. vol. 37, 155-56.) In light of this plausible explanation for the prosecutor's comment, the jury would not necessarily have viewed the comment as a comment on silence and the prosecutor's intent was not "manifestly impermissible." Accordingly, reasonable jurists could not debate that Diaz's right to remain silent was not violated.

## III. Conclusion

For the foregoing reasons, Diaz's Application for a Certificate of Appealability is GRANTED IN PART and DENIED IN PART.