United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 13, 2005**

Charles R. Fulbruge III
Clerk

REVISED OCTOBER 18, 2005

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

———————

No. 04-70052

———————

HUMBERTO LEAL,

Petitioner-Appellant,

versus

DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS
DIVISION,

Respondent-Appellee.

Appeal from the United States District Court
For the Western District of Texas

Before GARZA, DeMOSS, and CLEMENT, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Convicted of capital murder and sentenced to death, Humberto Leal, Jr. petitions for a

Certificate of Appealability ("COA") from the denial of his petition for federal habeas corpus relief.

Leal claims that his trial counsel rendered ineffective assistance and that the Texas capital sentencing

scheme's special issues are unconstitutionally vague.

I

The tragic final hours of sixteen-year-old Adrea Sauceda's life started at an outdoor party in

San Antonio, Texas. A witness observed Sauceda, apparently intoxicated and partially undressed,

in the middle of a circle of men who were taking turns "on top of her." Another witness testified that

an unidentified male invited him to have intercourse with Sauceda. The same witness testified that

he later observed another man carrying a disoriented Sauceda to a truck, where he "had his way with

her." On direct appeal, the Texas Court of Criminal Appeals summarized the evidence of the events

that followed:

> The twenty-three-year-old appellant [Leal] was also at the party. At some point the intoxicated but conscious victim was placed in appellant's car. Appellant and the victim left together in appellant's car.

> About thirty minutes later, appellant's brother arrived at the party in a car which came to a screeching halt. Appellant's brother was very excited or hysterical. Appellant's brother started yelling to the people left at the party, "What the hell happened!" Appellant's brother was yelling that appellant came home with blood on him saying he had killed a girl. Witnesses Torres and Ortega were present when appellant's brother made these statements. Shortly thereafter appellant's brother left in a rush.

> Several of the party members went looking for the victim in the same area where the party was. They found her nude body lying face-up on a dirt road. They noticed the victim's head had been bashed in and it was bleeding. Her head was flinching or jerking. These party members called the police.

> When the police arrived, they saw the nude victim lying on her back. There was a 30 to 40 pound asphalt rock roughly twice the size of the victim's skull lying partially on the victim's left arm. Blood was underneath this rock. A smaller rock with blood on it was located near the victim's right thigh. There was a gaping hole from the corner

of the victim's right eye extending to the center of her head from which blood was oozing. The victim's head was splattered with blood.

There was a bloody and broken stick approximately 14 to 16 inches long with a screw at the end of it protruding from the victim's vagina. Another 4 to 5 inch piece of the stick was lying to the left side of the victim's skull. The police made a videotape of the crime scene portions of which were admitted into evidence.

Later that day, the police questioned appellant. Appellant gave two voluntary statements. In appellant's first statement he said he was with the victim in his car when she began hitting him and the steering wheel causing him to hit a curb. Appellant attempted to calm her down but the victim leaped from appellant's car and ran away. Appellant claimed he sat in his car and waited about ten or fifteen minutes to see if the victim would return and when she did not he went home.

After giving this statement, appellant was informed that his brother had also given a statement. Appellant then gave another statement. In this statement, appellant claimed he followed the victim when she got out of his car and ran away. Appellant claimed the victim attacked him. Appellant pushed her and she fell to the ground. When she did not get up appellant attempted to wake her but could not. He then looked at her nose and saw bubbles. Appellant stated he got scared, went home, prayed on the side of his mom's bed and told family members what had happened, claiming it was just an accident. After giving this statement an officer gave appellant a ride home.

The police searched appellant's house. The police seized a blouse which contained several blood stains, hair and fibers. This blouse was later identified as belonging to the victim. The police also seized appellant's clothing from the night before. Appellant was arrested later that afternoon at his home.

Appellant's car was also impounded. The police conducted Luminol tests of the passenger door to determine whether any blood was evident. Blood stains were discovered on the passenger door and seat. Detectives testified that the blood stains were streaked in a downward motion, indicating that the blood had been wiped off. There was insufficient residue to conduct a blood typing of the stains

-3-

on the vehicle. Other DNA evidence was found on the underwear appellant was wearing that night. That evidence consisted of blood as well as bodily fluid. The DNA test did not preclude the victim's blood type from the evidence tested.

Dr. DiMaio, the medical examiner who performed the autopsy, testified about the victim's injuries and cause of death. DiMaio testified that even though the victim was intoxicated when she received her injuries, she would have been aware of what was happening to her. In addition to the victim's massive head injuries, DiMaio testified about injuries the victim received to her chest and shoulder which were consistent with having been inflicted by the stick found in the victim's vagina. DiMaio also testified about the defensive wounds the victim received to her hands trying to protect herself from some object. DiMaio also testified the victim was alive when the stick was placed in her vagina. The victim's neck also contained injuries consistent with manual strangulation.

DiMaio testified the victim received some of her injuries while standing up. The victim received her head injuries while lying flat. The injuries to the victim's head were due to blows from the front. These injuries were inconsistent with a fall. The victim's head injuries were consistent with the victim lying on the ground with somebody standing over her striking her. DiMaio testified the large rock could have delivered the injuries to the victim's head. Based on the injuries to the victim's head, DiMaio testified the victim would had to have been struck with the rock two or three times. DiMaio testified the victim died from blunt force trauma injuries to the head. DiMaio could not say for certain that the rock caused the injuries. He testified the victim was beaten about the face with a blunt object or more than one object which could have been the rock or something else. On cross-examination, DiMaio testified that one blow from the rock could have caused the victim's death.

DiMaio also testified about bite marks he found on the victim's left cheek, the right side of her neck and the left side of her chest. Another witness compared the bite marks on the victim's chest and neck with dental impressions of appellant's teeth. They matched.

The State's indictment charged that Leal killed Sauceda while in the course of and attempting either to kidnap her or to commit aggravated sexual assault. Leal was convicted and, after a separate

-4-

punishment phase, sentenced to death. The Texas Court of Criminal Appeals affirmed Leal's conviction and sentence on direct appeal. After conducting an evidentiary hearing, the trial court recommended that Leal's application for habeas relief be denied, and the Texas Court of Criminal Appeals so ordered. The federal district court denied Leal's petition for federal habeas corpus relief pursuant to 28 U.S.C. § 2254 and *sua sponte* denied a COA.

II

To obtain a COA, Leal must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy this standard, he "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003). "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Id.* at 342. While the nature of a capital case is not of itself sufficient to warrant the issuance of a COA, in a death penalty case "any doubts as to whether a COA should issue must be resolved in [the petitioner's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000) (citing *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000)).

In determining whether a COA should be granted, we remain cognizant of the standard of review imposed upon the district court by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). A district court may grant habeas relief only if it determines that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1), (2). The state court's findings of fact are entitled to a presumption of correctness and the petitioner may overcome that presumption only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## III

Leal argues that the state and federal habeas courts failed to consider his counsel's[1] duty to investigate and the cumulative effect of counsel's deficiencies. He does not, however, explain for which of his ineffective assistance claims he seeks a COA. We limit our consideration to those claims that Leal briefed in at least some appreciable manner: counsel's failure to (1) adequately investigate and contest the State's DNA evidence; (2) challenge the State's luminol evidence; (3) challenge the State's evidence regarding bite marks on Sauceda's body; (4) investigate and present the testimony of Leal's family members; and (5) present certain physical evidence. *See Martin v. Cain*, 246 F.3d 471, 475 n.1 (5th Cir. 2001) (refusing to consider claims not briefed even though the petitioner requested a COA with respect to the "full range" of his ineffective assistance claims).

To establish ineffective assistance of counsel, Leal must demonstrate both that his counsel's performance was deficient and that the deficiency prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show deficient performance, Leal must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. Performance is prejudicial only if, but for counsel's errors, there is a reasonable probability that the final result would have been different and confidence in the

---

[1] Attorneys Vincent D. Callahan and Jose M. Guerrero represented Leal at trial. Callahan had both trial and appellate experience in capital cases.

-6-

reliability of the verdict has been undermined.  *Little v. Johnson*, 162 F.3d 855, 860-61 (5th Cir. 1998).  Failure to prove either prong will defeat an ineffective assistance claim.  *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).  We begin with the presumption that counsel has rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  *See Strickland*, 466 U.S. at 689-90.

A

The State presented expert testimony at trial that blood found on Leal's underwear could have come from Sauceda, but could not have come from either Leal or his girlfriend.  Leal  petitioned for habeas corpus relief on the ground that his counsel failed to:  (1) request the appointment of a DNA expert; (2) interview before trial or question on *voir dire* the prosecution's DNA experts; and (3) adequately cross-examine the State's experts.

The state habeas court found that Leal gave his trial counsel differing versions of the relevant events, including one in which Leal admitted that he had unintentionally caused Sauceda's death and then sat down on top of her while attempting to revive her.  The court held that, in light of Leal's statements, trial counsel's decision not to further contest the prosecution's DNA evidence did not constitute ineffective assistance.  The court further held that Leal had failed to satisfy the prejudice prong of *Strickland*.  Applying the AEDPA standard, the federal district court concluded that the state court's application of both prongs of the *Strickland* test was objectively reasonable.

Reasonable jurists could not debate the district court's conclusion that the state court was objectively reasonable in holding that Leal failed to satisfy *Strickland's* prejudice prong.  Leal's DNA expert, Dr. Tryon, testified that the DNA results obtained from the examination of Leal's underwear, while consistent with Sauceda's blood, were not definitive.  The court found that the expert's

testimony was not inconsistent with the trial testimony of the State's DNA experts. As the district court noted, while Dr. Tryon questioned the State's testing procedures and the definitiveness of the results, the testimony did not show that the appointment of a DNA expert, or pre-trial interview or *voir dire* questioning of the State's witnesses, would likely have resulted in either the development of exculpatory evidence or the exclusion of State evidence. Further, any arguable weakening of the State's DNA evidence resulting from testimony questioning the testing procedures must be viewed in light of the totality of the evidence the State produced at trial. *See United States v. Royal*, 972 F.2d 643, 651 (5th Cir. 1992) (holding that overwhelming evidence of guilt supported conclusion that defendant had not been prejudiced by counsel's performance). After reviewing Dr. Tryon's testimony and the trial record, we are convinced that reasonable jurists could not debate the district court's conclusion that, in light of the evidence produced at trial, the state court's conclusion that Leal failed to satisfy the prejudice prong of *Strickland* was objectively reasonable.[2]

B

San Antonio Police Officer Warren Titus testified at Leal's trial that testing of the interior of Leal's car indicated the presence of blood in several locations in a manner consistent with someone being seated when the blood was transferred. The state habeas court found that prosecutors relied on the luminol results as evidence that Leal kidnaped Sauceda. Leal, in turn, testified that his father had used the car to go deer hunting and that this fact might explain the presence of blood in the

---

[2] Because we conclude that reasonable jurists could not debate the district court's conclusion that Leal failed to demonstrate prejudice, we do not reach Leal's claim of deficient performance. *See Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."). We therefore need not address Leal's argument that the state court's ineffective assistance analysis failed to consider defense counsel's duty to conduct adequate investigation.

vehicle. Leal argues that his counsel provided ineffective assistance by failing to: (1) cross-examine Titus; (2) interview Titus before trial or conduct a *voir dire* examination; or (3) seek appointment of a defense expert on the issue.

At the state habeas corpus hearing, Leal questioned Titus on his understanding of luminol testing. Titus testified that, at the time of the habeas hearing, he had conducted at least a dozen luminol tests on vehicles. Responding to questions from Leal, Titus testified that he was aware that luminol was only a presumptive test, but was unsure whether luminol reacted with the hemoglobin in blood or reacted better with fresh or decomposed blood. He testified that luminol could react with substances other than blood, but explained that time-lapse photography could establish whether luminol was reacting to blood or a substance such as bleach. Finally, Titus testified that he did not know whether luminol reacted with animal blood. The state habeas court found that Leal had not presented any evidence that his father had *recently* killed a deer or placed a dead animal in the car, the car was tested only days after the murder, deer hunting was not lawful in South Texas in the Spring (the murder having occurred in May), and Leal gave his counsel varying accounts of his time with Sauceda, including one in which Leal admitted that there had been a struggle inside the car. The court concluded that counsel's actions did not constitute ineffective assistance and that Leal had failed to demonstrate prejudice. The district court concluded that the state court had reasonably applied both prongs of the *Strickland* test.

Reasonable jurists could not debate the district court's determination. Leal introduced no evidence that interviewing Titus prior to trial or cross-examination during trial would have produced evidence suggesting that Titus performed the luminol tests in an unreliable manner or that Titus's testimony was misleading. Leal's claim that effective counsel might have been able to exclude Titus's

testimony based on his testimony at the habeas hearing is wholly unsubstantiated. Leal also presented the state habeas court with no new expert testimony or other evidence suggesting that a court-appointed defense expert would have benefitted Leal at trial.

C

The State also introduced evidence during the guilt phase of Leal's trial that bite marks on Sauceda's body matched Leal's teeth. Leal sought habeas corpus relief on the ground that his trial counsel rendered ineffective assistance by failing to interview the State's expert regarding the bite-mark evidence and by failing to seek appointment of a defense expert on the issue. The state habeas court found that one of Leal's counsel consulted with a dentist, Dr. Jose Aguirre, concerning the bite-mark evidence and that the dentist's conclusions were consistent with those of the State's dental expert. The court concluded that counsel's performance was not deficient and that Leal had not demonstrated prejudice. The federal habeas court found objectively reasonable the state court's application of both prongs of the *Strickland* test.

Reasonable jurists could not debate the district court's holding with regard to the performance prong of Leal's *Strickland* claim. Leal's claim that his counsel failed to conduct any investigation prior to trial is, particularly with respect to this claim, insupportable in light of the record. Leal's counsel consulted a dentist regarding the bite marks on Sauceda's body and the State expert's conclusions, and effectively cross-examined the State's expert on the bite-mark evidence. Leal introduced no evidence at the state habeas hearing showing that Dr. Aguirre was unqualified to render an opinion regarding the bite marks found on Sauceda's body. To the contrary, Leal's expert testified during the state habeas hearing that every dentist is competent to give an opinion regarding bite marks. In light of Dr. Aguirre's conclusion, reasonable jurists could not debate the conclusion that

-10-

the state court reasonably applied federal law in determining that trial counsel's actions did not fall to the level of deficient performance.

D

Leal alleges that his counsel provided ineffective assistance in not calling members of his family to testify. Specifically, Leal argues his counsel should have called his brother, Gaulberto, and sister, Nancy Leal Sanchez, to testify that they saw other party-goers with blood stains on their clothes and in possession of Sauceda's purse. He also argues counsel should have called his father, Humberto Leal, Sr., to testify that he found Sauceda's blouse outside their home after the murder and mistakenly thought it belonged to a family member (thus explaining its presence in the Leal home), that he saw no blood on the car the morning after the murder, and that he used the car for deer hunting. Finally, Leal claims his counsel should have called his mother, Maria Francesca Garcia de Leal, to corroborate his father's story regarding the blouse.

All four family members testified at the state habeas proceeding. The court found Nancy Leal Sanchez's testimony not credible based on discrepancies in her affidavit and testimony, and that none of the family members had told Leal's counsel about other men at the party having blood on their clothes. The court concluded that Leal had not satisfied the prejudice prong of *Strickland*. The federal habeas court found the state court's conclusion objectively reasonable.

After reviewing the testimony at the state habeas hearing, we find that reasonable jurists could not debate the district court's resolution of this issue. As the district court noted,

> had Nancy testified at [Leal's] trial in the same manner that she testified at [his] state habeas corpus hearing, an astute prosecutor could have used her testimony to further inculpate [Leal]. Furthermore, Gualberto's affidavit, introduced and admitted into evidence during [Leal's] state habeas corpus proceeding, would have

-11-

furnished the prosecution with further evidence to impeach Gualberto's claims that [Leal] never confessed to having killed a girl.

Further, Leal's parents' testimony regarding Sauceda's blouse fails to explain how Sauceda's blouse came to be in front of the Leal home, given Leal's testimony that he left Sauceda unconscious and fully-clothed blocks from his home. Finally, Leal presented no evidence that his father had recently placed a dead animal in the car, or that his father had cleaned any animal blood from the interior of the car. In light of the other evidence introduced at trial, reasonable jurists could not debate the court's conclusion that "[t]here is simply no reasonable probability that, but for the failure [to call Leal's family members,] the outcome of either phase of petitioner's trial would have been any different."

E

Leal next argues that his trial counsel rendered ineffective assistance by failing to present available evidence showing that: (1) no fingerprints could be obtained from the stick that was inserted in Sauceda's vagina; (2) no spermatozoa cells were found on an anal swab taken during Sauceda's autopsy; and (3) pubic and head hair found on Sauceda's body did not match Leal.

The state court concluded that Leal had failed to demonstrate ineffective assistance of counsel, and the federal district court found this holding an objectively reasonable application of *Strickland*. The federal court noted that Leal had not alleged any specific facts showing that the absence of fingerprints was exculpatory or mitigating in nature and found that, given the overwhelming evidence of Leal's guilt, there was no reasonable probability that the absence of identifiable fingerprints would have any impact at either phase of Leal's trial. The court also observed that Texas Department of Public Safety serologist Donna Stanley had testified at Leal's trial that,

-12-

when she examined the anal swabs under a microscope, she was unable to identify any sperm cells. Finally, with regard to the hair found on Sauceda, the court noted that Leal offered the state habeas court no evidence that any subsequent examination, identification, or comparison of the hairs was undertaken by any person. The district court also correctly observed that the hair found on Sauceda, even if Leal could show it came from one of the other party-goers, is consistent with the evidence presented at trial that other men had engaged in or attempted intercourse with Sauceda at the party. Thus, the court reasoned, Leal had not demonstrated any possible benefit would have resulted had his trial counsel further investigated the hair evidence. Reasonable jurists could not debate the conclusion that these alleged deficiencies do not satisfy the prejudice prong of *Strickland*.

F

Leal further requests a COA on his claim that the cumulative errors of his trial counsel denied him his Sixth Amendment right to counsel, arguing that the state and federal habeas courts failed to consider the prejudice resulting from his counsel's alleged deficiencies globally rather than in isolation. Contrary to Leal's claim, both the state habeas court and federal district court considered and rejected his argument that "the totality of the circumstances in Mr. Leal's case reveals that both prongs of the *Strickland* test were met."

Even assuming that Leal has satisfied *Strickland*'s deficient performance prong with respect to all the above-analyzed claims save the dental evidence, reasonable jurists could not debate the district court's determination that the state court rejection of Leal's claim was objectively reasonable. The prosecution's evidence at the guilt phase of Leal's trial was overwhelming. Leal was the last person seen with Sauceda before her death, driving her away in his father's car. A State witness testified that Leal claimed that he knew Sauceda and her family and would take her home and explain

-13-

things to her family. Sauceda's nude, bloodied body was found shortly after Leal's brother and sister made a frantic appearance at the party, with Leal's brother stating that Leal had claimed to have killed a girl. Leal admitted to police that he fought with Sauceda and pushed her down, that she fell and did not get up, and that he abandoned her while she was unconscious and bleeding from the head. Forensic dental evidence strongly suggested that Leal had bitten Sauceda's body. The autopsy revealed massive injuries inconsistent with Leal's version of events and suggesting a deliberate and violent assault. Sauceda's state of undress and the stick inserted into her vagina obviously indicate that she was the victim of a sexual assault. Luminol testing suggested that blood had been wiped from inside Leal's car and was consistent with a person sitting in the passenger seat. Sauceda's blouse was found in Leal's home, and DNA evidence suggested that blood found on Leal's underwear could have come from Sauceda, but not from Leal or his girlfriend. The evidence of prejudice Leal produced at his state habeas hearing is simply insufficient to make debatable the district court's refusal to grant federal habeas relief.

IV

In addition to his ineffective assistance of counsel claims, Leal also argues that the Texas capital sentencing scheme's special issues are unconstitutionally vague because they fail to define certain words and phrases, including "probability," "criminal acts of violence," and "continuing threat to society." The state habeas court found this claim had previously been addressed in Leal's direct appeal, and was therefore not cognizable in a post-conviction petition for writ of habeas corpus. The court also noted that Leal's argument conflicted with clearly established state and federal law. The federal district court concluded that Leal's argument was foreclosed by Supreme Court and Fifth Circuit precedent, and was also foreclosed by the non-retroactivity doctrine of *Teague v. Lane*, 489

-14-

U.S. 288 (1989).

This court has already rejected the arguments Leal makes regarding the terms employed in the Texas capital sentencing scheme. *See Hughes*, 191 F.3d at 615 (holding that the term "probability," as used in the Texas capital sentencing special issues, does not require definition); *West v. Johnson*, 92 F.3d 1385, 1406 (5th Cir. 1996) (rejecting claim that the Texas capital sentencing scheme special issues work as aggravating factors and therefore require detailed definitions of the terms employed therein); *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996) (rejecting argument that the terms used in the special issues are "aggravating factors" and unconstitutionally vague absent definition); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993) (holding that the terms "deliberately," "probability," "criminal acts of violence," and "continuing threat to society," "have a common-sense core of meaning that criminal juries should be capable of understanding") (citation omitted); *Milton v. Procunier*, 744 F.2d 1091, 1095-96 (5th Cir. 1984) ("deliberately," "probability," and "criminal acts of violence" "have a plain meaning of sufficient content that the discretion left to the jury" is "no more than that inherent in the jury system itself"). Reasonable jurists could not find the district court's resolution of this issue debatable.

V

For the above stated reasons, Leal's application for a COA is DENIED.