# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 10, 2010

No. 08-70048

Lyle W. Cayce
Clerk

GARY CARL SIMMONS, JR.,

Petitioner–Appellant

v.

CHRISTOPHER B. EPPS, COMMISSIONER, MISSISSIPPI DEPARTMENT
OF CORRECTIONS,

Respondent–Appellee

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:04-CV-00496

Before DAVIS, GARZA, and PRADO, Circuit Judges.

PER CURIAM:[*]

Gary Simmons was charged in Mississippi state court with the murder of
Jeffrey Wolfe. The jury found Simmons guilty, and the state court judge
sentenced him to death. Simmons petitioned unsuccessfully for post-conviction
relief in state court. He filed a habeas petition in federal district court. Then,
he requested the issuance of a certificate of appealability ("COA") on three
grounds: (1) whether the trial court erroneously allowed the prosecution to

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 08-70048

submit to the jury an aggravating circumstance without sufficient evidentiary support in violation of the Sixth, Eighth, and Fourteenth Amendments; (2) whether Simmons was denied effective assistance of counsel during the penalty phase of his trial, in violation of the Sixth and Fourteenth Amendments; and (3) whether the trial court erred during the sentencing phase of his trial by excluding relevant mitigating evidence in violation of the Sixth, Eighth, and Fourteenth Amendments. The district court granted a COA on the first ground, but not on the second or third ground. Simmons has now filed a motion to expand the COA to include the second and third grounds.

We deny Simmons's motion as to his second ground. We grant Simmons's motion as to his third ground.

## I.  FACTS

The details of the murder giving rise to this case are memorialized in opinions by the Supreme Court of Mississippi, *Simmons v. State*, 805 So. 2d 452 (2001) (*Simmons I*) and *Simmons v. State*, 869 So. 2d 995 (2004) (*Simmons II*), and the federal district court, *Simmons v. Epps*, No. 1:04-CV-00496, 2008 U.S. Dist. LEXIS 75398 (S.D. Miss. Sept. 26, 2008). Here, we briefly describe the facts only as they apply directly to this opinion.

Shortly after Wolfe's murder but before Simmons's arrest, Simmons recorded a videotape in which he told his ex-wife Lori how to dispose of his property. He also made comments which strongly implied that he committed a crime and felt remorse:

> I guess it's a real mess, isn't it?  It wasn't supposed to go like that. . . .  Things got pressing in.  I was in a bind three or four different ways.  To my way of thinking, I didn't have much of a choice.  I mean, I'd already taken his money.  There's no excuses.
> . . . .
> It's hard sitting here doing this, knowing under what conditions you'll probably be watching it.  I'm so dreadfully sorry.
> . . . .

2

No. 08-70048

> I didn't think about it until after it was done. And then it couldn't be undone. There was nothing in the world I could do to make it undone. And I would have. Oh, God, I would have. You never realize how close you are to the edge until you actually step over it.
> . . . .
> I don't know how it happened, I really don't. And after it had happened, I would have gave anything to take it back, even my life.

Simmons sent the videotape to Lori, who turned it over to Simmons's attorneys.

The day after the murder, Simmons's friend Dennis Guess came home to find Simmons asleep on his couch. Simmons apparently told Guess about the murder, and Simmons and Guess discussed Simmons's options, which included running, turning himself in, and committing suicide. They decided that he should turn himself in. Simmons called the police, and a deputy came and picked him up.

## II.  PROCEDURAL HISTORY

Simmons's friend Timothy Milano was tried separately for Wolfe's murder. In both Simmons's and Milano's trials, prosecutors argued that they worked together to kill Wolfe. Milano was found guilty and sentenced to life in prison.

During Simmons's trial, Guess testified that Simmons expressed remorse for the crime and that Simmons said he had hurt enough people and did not want to hurt anyone else. Simmons tried to introduce the videotape to show that he felt remorse for the murder, but the state court excluded it as self-serving hearsay. Simmons did not testify. In closing, the State said, "And at that point and [sic] time the only remorse that [Simmons] displayed, the only remorse that Mr. Guess testified to, was the fact that he, Mr. Simmons, had made a terrible mistake and the girl had gotten away." The State also argued that Simmons became "divorced" from his conscience at the time he and Lori divorced, and that "we are talking about the circumstances of this crime, him, this person who now has no conscience."

No. 08-70048

The jury convicted Simmons of rape, kidnapping, and capital murder with the underlying felony of robbery. At sentencing, Simmons did not testify. Simmons tried again to introduce the videotape, and again the court excluded it.

Also at sentencing, Simmons presented six witnesses to testify on his behalf: Jewell Simmons, his grandmother; Milton DuPuis, his half-brother; Dana Vanzante, a family friend; Lynette Holmes, his ex-wife's friend; Belinda Simmons West, his half-sister; and Lori. These witnesses testified that Simmons was a hard-working family man who held down two or three jobs, always paid the bills, and attended church regularly. They noted that Simmons doted on his and Lori's two daughters, provided them with a stable home environment, made sure they had plenty of food and toys, loved playing with them and brushing their hair, and enjoyed barbecues and other social events. The witnesses uniformly expressed shock that Simmons would commit a brutal murder, and implored the court to spare Simmons's life.

The witnesses who knew Simmons as a child explained that he had a difficult upbringing. Jewell Simmons testified that two of Simmons's uncles had been murdered, although she did not discuss the impact these deaths had on Simmons or whether Simmons was close with his uncles. DuPuis stated that his father (Simmons's step-father) beat the children regularly, and that as the oldest, Simmons endured the brunt of his rage. DuPuis recalled that his father once shot at Simmons when Simmons tried to defend Simmons and DuPuis's mother. DuPuis also credited Simmons with helping him to find God, although DuPuis noted that Simmons had become less religious since his divorce from Lori. Lori said that she still loved Simmons, but she acknowledged that she divorced Simmons after her daughter from a previous relationship accused him of misconduct and a court ruled that Simmons and the girl could not live under the same roof.

4

No. 08-70048

The judge sentenced Simmons to death.  Simmons filed a motion for post-conviction relief with the Supreme Court of Mississippi, based on numerous claims including the three he brought in federal court.  To support his claim for ineffective assistance, Simmons presented two affidavits signed by Tomika Harris, an investigator with the State of Mississippi who interviewed witnesses in Simmons's case after his conviction.  In one affidavit, Harris stated that she interviewed Jewell and Belinda in Jewell's home.  During the interview, Harris noticed numerous pictures of Simmons on the wall, and she concluded (either because Jewell told her or through her own deduction) that each picture meant a lot to Jewell and that Jewell left them up so people would know she was thinking of Simmons.  Harris's affidavit also reported that Jewell and Belinda described Simmons as a family-oriented man who loved his daughters, and stated that they loved Simmons, that the verdict upset them, that Milano was the shooter, and that the verdict was at least partially due to lies that Milano told the police.

Gary Carl Simmons, Sr. ("Butch"), Simmons's father, lived with Jewell.  Although Butch was present at the time of the interview and seemed disturbed by the situation, he would not talk with Harris.  Because she lived with Butch, Jewell did not want to sign an affidavit.

Harris gleaned that Mildred, Simmons's mother, did not attend the trial because she was embarrassed and worried what people would think of her.  Harris learned that Mildred and Butch divorced when Simmons was a child, and Mildred moved to Florida with Simmons.  Jewell and Belinda told Harris that Mildred had a gambling problem and would often play bingo and gamble away the money she was supposed to use to buy food and pay the bills, would leave the children at home when she went to the bingo parlor, and once asked Jewell for help paying her light bill after losing money at bingo.  Harris also learned that

No. 08-70048

Mildred remarried when Simmons was three and that Simmons's step-father was very mean to him.

In the second affidavit, Harris stated that she called Lori to set up an in-person interview. Lori refused, explaining that she was bitter because Simmons left her to raise the children on her own. After their brief conversation, Harris concluded that Lori had information which was valuable to Simmons's defense, and which only Lori could supply. Harris did not explain what led her to this conclusion.

The Supreme Court of Mississippi rejected all of Simmons's claims. As for his ineffective assistance claim, the court observed that most of the information in Harris's affidavits was presented at trial. *Simmons II*, 869 So. 2d at 1003. Viewing the affidavits as a whole, the court concluded that "Simmons has not submitted sufficient evidence of a [constitutionally deficient] breach of the duty of counsel to investigate and present mitigation evidence." *Id.*

The court also rejected Simmons's claim that the state trial court violated his due process rights when it excluded the videotape during the sentencing phase. The court explained, "A declaration made by a defendant in his own favor . . . is not admissible for the defense . . . because there is nothing to guarantee its trustworthiness." *Simmons I*, 805 So. 2d at 489 (quotation and emphasis omitted). The court reasoned that if such evidence were admissible, "the door would be thrown open to obvious abuse: an accused could create evidence for himself by making statements in his favor for subsequent use at his trial to show his innocence." *Id.* (quotation and emphasis omitted).

Three justices dissented. While agreeing that the trial court correctly excluded the videotape during the guilt phase, the dissenting justices believed that the trial court erred by excluding the videotape during the sentencing phase. *Id.* at 509 (Diaz, J., concurring in part and dissenting in part). The dissenting justices stated that "[a]fter reviewing the tape, some of [Simmons's]

6

statements can be interpreted as remorseful and thus mitigating in the eyes of the jury. Certainly, they appear to rebut the prosecution's claim that [Simmons] showed no remorse whatsoever." *Id*. at 510. The dissenting justices concluded that they "would find that it was reversible error for the trial court to exclude this videotape as mitigating evidence during the sentencing phase of the trial and would, therefore, vacate Simmons' death sentence and remand the matter to the trial court for a new sentencing hearing." *Id*.

Simmons filed a habeas petition in district court. To support his ineffective assistance claim, Simmons included several exhibits that he had not presented to the state court. These exhibits included: (1) an affidavit from Simmons's trial counsel Michael Cunningham, who stated that he would testify to the following: that neither he nor his co-counsel moved the state court for funds to employ an investigator; that they did not seek any mitigation specialist, psychologist, or other mental health professional to analyze Simmons and investigate possible mitigation theories; that they did not review any of Simmons's school, military, medical/psychological, or pretrial incarceration records in any effort to investigate personal history details that might support a mitigation case; that they did not investigate any violent crimes committed against Simmons's family members, such as the murders of Simmons's two uncles; and that they did not investigate the details of Simmons's personal childhood violence, such as the violence Simmons suffered at the hands of his step-father; (2) an affidavit from Andre de Guy, a death penalty expert who outlined all of the areas an attorney "must" research when representing a defendant in a capital case; (3) an itemized statement of the hours worked by Simmons's attorneys; (4) a newspaper article in which Simmons's pastor stated that Simmons desperately needed help before the murder, that Simmons had reached out to the pastor, that the pastor felt badly that he had not been more sensitive to Simmons's needs, and that the pastor had never detected any

animosity between Simmons and African American members of the congregation despite an allegation that Simmons often tried to persuade teenagers to attack and kill African Americans; (5) an excerpt from a textbook on capital punishment, which emphasized that capital defense attorneys must research mitigation subjects exhaustively; and (6) an affidavit from Gary Mooers, a mitigation expert who opined that two of the areas which counsel failed to investigate sufficiently—violent crimes against close relatives and personal childhood violence—might lead to significant mitigation evidence if properly investigated.

The district court found that Simmons's failure to present this new evidence of ineffective assistance to the Mississippi Supreme Court likely barred its introduction.  In the alternative, the district court found that Simmons failed to demonstrate either deficient representation or prejudice, thus failing both prongs of the test for ineffective assistance of counsel described in *Strickland v. Washington*, 466 U.S. 668 (1984).  Accordingly, the district court denied Simmons's request for a COA on his second ground.

Regarding Simmons's first ground that the trial court erroneously allowed the prosecution to submit to the jury an aggravating circumstance without sufficient evidentiary support, the district court granted a COA because it found that reasonable jurists could debate the issue.  Regarding Simmons's third ground that the trial court erred by excluding relevant mitigating evidence, the district court denied Simmons's COA request because it found that reasonable jurists could not debate the issue.

Simmons filed his motion to expand the COA.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petitioner can appeal a district court's dismissal of a habeas petition only if the district or appellate court issues a COA.  28 U.S.C. § 2253(c); *see also Miller-El*

*v. Cockrell*, 537 U.S. 322, 335–36 (2003). Because the district court denied Simmons's request for a COA as to two of his claims, Simmons must seek a COA from this Court to obtain further review of those two claims. *See* 28 U.S.C. § 2253(c); *see also Coleman v. Quarterman*, 456 F.3d 537, 541 (5th Cir. 2006).

We will issue a COA if Simmons can make "a substantial showing of the denial of a constitutional right" by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). At this stage, our inquiry "is a threshold inquiry only, and does not require full consideration of the factual and legal bases of [Simmons's] claim." *Neville v. Dretke*, 423 F.3d 474, 482 (5th Cir. 2005). Because Simmons was sentenced to death, "we must resolve any doubts as to whether a COA should issue in his favor." *Martinez v. Dretke*, 404 F.3d 878, 884 (5th Cir. 2005).

In determining whether reasonable jurists would debate the district court's assessment of Simmons's claims, we keep in mind that the district court's decision must be made pursuant to AEDPA's deferential standards. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Leal v. Dretke*, 428 F.3d 543, 548 (5th Cir. 2005). AEDPA permits a federal district court to grant relief only on two bases. First, the petitioner is entitled to relief if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *Leal*, 428 F.3d at 548.

A decision is contrary to federal law if it is "opposite to that reached by [the Supreme] Court on a question of law" or if it resolves a case differently from the way the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A decision unreasonably applies federal law when it "identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular

state prisoner's case." *Id*. at 407.  A state court decision also unreasonably applies federal law if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id*.

Second, the petitioner is entitled to relief when the state court decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Leal*, 428 F.3d at 548.   "The state court's findings of fact are entitled to a presumption of correctness and the petitioner may overcome that presumption only by clear and convincing evidence." *Leal*, 428 F.3d at 548 (citing 28 U.S.C. § 2254(e)(1)).

## IV. ANALYSIS

### A.    Whether Simmons's Counsel was Constitutionally Ineffective under *Strickland*

In *Strickland*, the Supreme Court set forth a two-prong test for evaluating claims of ineffective assistance of counsel.  Under this test, a defendant must show (1) that his counsel's performance was deficient, and (2) that this deficient performance prejudiced the defendant. 466 U.S. at 687.  Here, reasonable jurists could not debate whether the Supreme Court of Mississippi reasonably applied the *Strickland* test when it determined that the state trial court did not violate Simmons's constitutional right to effective assistance of counsel.  Accordingly, we find that the district court correctly denied Simmons's request for a COA on his ineffective assistance claim.

#### 1.    Exhaustion

The State argues that Simmons failed to exhaust his claim for ineffective assistance of counsel because his new evidence renders this claim "substantially different" than his state-court claim.  We do not agree.  Section 2254(b)(1) requires federal habeas petitioners to exhaust state court remedies before

10

proceeding in federal court. To satisfy this exhaustion requirement, "a habeas petitioner must have fairly presented the substance of his claim to the state courts." *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997). The exhaustion requirement is not satisfied if a petitioner "presents *material* additional evidentiary support to the federal court that was not presented to the state court." *Graham v. Johnson*, 94 F.3d 958, 968 (5th Cir. 1996) (emphasis added). For evidence to be material, it must "'place[] the claims in a significantly different legal posture.'" *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) (quoting *Demarest v. Price*, 130 F.3d 922, 932 (10th Cir. 1997)). Dismissal is not required if the evidence places the petitioner's claims in a "comparatively stronger evidentiary posture," *id*. at 388, "but does not fundamentally alter[] the claim presented to the state courts." *Id*. (quoting *Caballero v. Keane*, 42 F.3d 738, 741 (2d Cir. 1994)).

The new evidence primarily serves to reinforce topics that Simmons presented to the state court—that he had a difficult and painful childhood, that members of his family had been murdered, that he was generally a kind and loving (if troubled) man, and that his attorneys failed to investigate these topics adequately. Although some of the evidence gives additional details, it does not fundamentally alter the claim presented to the state court. Accordingly, Simmons sufficiently exhausted his ineffective assistance claim in state court and may present this new evidence in federal court.

2.    Deficient Performance

To satisfy *Strickland*'s first prong, Simmons must show that his counsel committed "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Counsel's performance is considered deficient if it "falls below an objective standard of reasonableness" as measured by professional norms. *Id*. at 688. In analyzing counsel's performance, we make every effort to "eliminate the

distorting effects of hindsight," *id.* at 689, and we do not assume that counsel's performance is deficient "merely because we disagree with trial counsel's strategy." *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999). At the same time, "in the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett*, 239 F.3d 683, 688 (5th Cir. 2001) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332–33 (5th Cir. 1983)).

Simmons argues that Cunningham's affidavit shows that Cunningham and his co-counsel completely failed to investigate Simmons's childhood, and that their performance at sentencing was deficient. Although Cunningham's affidavit acknowledges certain shortcomings, it is not the wholesale *mea culpa* that Simmons describes. Cunningham's affidavit admits that counsel failed to investigate certain records, the facts or circumstances of the murders of Simmons's uncles, and the details of the violence committed by Simmons's step-father. This is very different from a complete failure to investigate. In fact, counsel presented six mitigation witnesses. At least three of them—Jewell, Belinda, and Dupuis—had intimate knowledge of Simmons's childhood and spoke directly to the privations he suffered as a youth, specifically referencing the deaths of Simmons's uncles and the violence of his step-father, including the fact that his step-father once shot at him for trying to defend his mother.

The relevant inquiry is not whether counsel performed *any* investigation—it is whether "the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). In *Wiggins*, Wiggins argued that his trial counsel had failed to investigate sufficiently his dysfunctional upbringing. *Id.* at 516. To support his claim, Wiggins presented evidence of his horrendous childhood:

> [Wiggins's] mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to

No. 08-70048

eat paint chips and garbage. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked. She had sex with men while her children slept in the same bed and, on one occasion, forced [Wiggins's] hand against a hot stove burner—an incident that led to [Wiggins's] hospitalization. At the age of six, the State placed Wiggins in foster care. [Wiggins's] first and second foster mothers abused him physically, and . . . the father in his second foster home repeatedly molested and raped him. At age 16, [Wiggins] ran away from his foster home and began living on the streets. He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion. After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor.

*Id.* at 516–17 (citations omitted). Wiggins's attorney knew at least some of these facts, but did not investigate to uncover them fully and did not present them as mitigating evidence at sentencing. *Id.* at 533–34. The Court found that the decision not to investigate fully was objectively unreasonable; therefore, the attorney's performance was deficient. *Id.*

Likewise, in *Neal* we found that Neal's attorneys provided deficient representation. Neal's attorneys failed to investigate sufficiently and present evidence about Neal's truly horrendous experiences as a child and young adult in a facility for mentally handicapped children and later in a maximum-security mental institution, which included physical and sexual abuse and multiple alleged gang-rapes, one of which included as many as thirty to forty attackers. *Neal*, 239 F.3d at 689–90. We found that Neal's attorneys failed to contact Neal's sister, who had actually contacted them and would have testified on Neal's behalf; probably did not sufficiently develop the testimony of Neal's mother; and failed to prepare their psychological expert adequately, not even telling her what crimes Neal was charged with or any facts about his personal history. *Id.* at 690–91. We found the failure of Neal's attorneys even more

13

troubling because "most of the mitigating evidence was readily available and would have cost no more than several long distance telephone calls or postage stamps." *Id.* at 691.

Simmons points to *Jackson v. Calderon*, a Ninth Circuit capital case that also dealt with a claim for ineffective assistance of counsel at the sentencing phase. In that case, the court found the representation provided by Jackson's attorney was deficient after the attorney stated that he "never expected Jackson's trial to reach the penalty phase, and his preparation reflected that view," and that "[t]he total investigation for purposes of the penalty phase took less than two hours some weeks before the trial began." 211 F.3d 1148, 1161–62 (9th Cir. 2000). The court found that Jackson's attorney failed to investigate and present evidence that Jackson was "addict[ed] to PCP and the meaning and consequences of such addiction," that Jackson "was grossly intoxicated" on PCP at the time of the murder, and that Jackson was so intoxicated that he "could remember little of the incident" and "was unable to think consciously at the time of the crime." *Id.* at 1162–63.

If Jackson's attorney had investigated and presented this evidence, "the jury would have been presented with a different medical picture of Jackson's state of consciousness than the one they received, which was no picture at all." *Id.* at 1164. Further, Jackson's attorney failed to present evidence of Jackson's tumultuous childhood, which included "repeated beatings," chokings by his mother when she was angry with him, neglect, instability, signs of mental illness, and a diagnosis of schizophrenia. *Id.* at 1163.

In *Wiggins*, *Neal*, and *Jackson*, the defendants' attorneys were on notice that further research would have unearthed additional material information, but fundamentally failed to perform that research. Here, Simmons has not shown that there *was* such additional material information. Further, it seems that Cunningham and his co-counsel performed at least some investigation into the

14

deaths of Simmons's uncles and the violence Simmons suffered as a child. It is not clear how thorough the investigation was. It is possible that a reasonable attorney would have investigated these issues more extensively. Also, Simmons asserts that counsel did not ask the court for funds to employ an investigator for any purpose other than DNA analysis. It is possible that a reasonable attorney would have at least tried to get an investigator to explore Simmons's childhood. Further, it is unclear how thoroughly counsel prepared the mitigation witnesses. On the other hand, counsel performed enough research to present several witnesses who provided coherent testimony. Viewed as a whole, this testimony provided a detailed account of the privations Simmons suffered as a child. Certainly, the performance of Simmons's attorney far surpassed that of the attorneys in *Wiggins*, *Neal*, and *Jackson*.

Under § 2254, we afford great deference to the Mississippi Supreme Court. We conclude that jurists could not reasonably debate whether the Mississippi Supreme Court applied *Strickland* unreasonably when it found counsel's investigation was not deficient.

Simmons also argues that under *Williams v. Taylor*, 529 U.S. 362 (2000), counsel's performance was *per se* deficient because counsel failed to secure Simmons's military, school, and other records. We do not agree that *Williams* creates such a bright-line rule. The *Williams* Court performed a holistic analysis, under which counsel's failure to secure records was only one of numerous factors that led the Court to find deficient representation. 529 U.S. at 395–96. Other factors included counsel's failure to prepare for the sentencing phase until a week before trial, uncover records "not because of any strategic calculation but because [counsel] incorrectly thought that state law barred access to such records," introduce available evidence that Williams was borderline mentally retarded, introduce available mitigating testimony of prison guards, and return the phone call of a certified public accounted who visited

15

Williams regularly and offered to testify that Williams seemed to thrive in the regimented prison environment and was proud of the carpentry degree he received while in prison. *Id.* While we acknowledge that counsel's failure to secure Simmons's records is troubling, we do not agree with Simmons that *Williams* renders this failure constitutionally deficient.

In addition, Simmons argues that counsel's failure to call a mitigation or psychological expert constitutes deficient performance. We disagree. States have a constitutional obligation to provide an indigent criminal defendant with access to a psychiatrist in two circumstances: "(1) 'when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial' and (2) 'in the context of a capital sentencing proceeding, when the State presents psychiatric evidence of the defendant's future dangerousness.'" *White v. Johnson*, 153 F.3d 197, 200 (5th Cir. 1998) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985)); *see also Bishop v. State*, 812 So. 2d 934, 939 (Miss. 2002) (finding that a defendant is not entitled to a psychological expert to help present mitigation evidence "where he has not raised insanity as a defense or where the State does not plan to submit psychological evidence against the defendant."). Simmons does not argue that he demonstrated to the trial judge that his sanity would be a significant factor at trial or that the State presented psychiatric evidence of his future dangerousness. Simmons was not constitutionally entitled to a mitigation or psychological expert.

Further, Simmons argues that under *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990), counsel's representation was deficient because counsel failed to investigate the possibility that Simmons suffered from mental defects or organic brain damage at the time of the murder. *Bouchillon* does not articulate a *per se* rule that an attorney who fails to investigate the possibility of mental defects or organic brain damage fails the first *Strickland* prong. In that case, Bouchillon's

16

attorney was on notice that Bouchillon suffered from post-traumatic stress disorder ("PTSD"), had been institutionalized, and was on medication. *Bouchillon*, 907 F.2d at 596. Despite these facts, the attorney allowed Bouchillon to enter a guilty plea without investigating whether Bouchillon was competent to do so. *Id.* at 590–91. In fact, the attorney even dissuaded Bouchillon when Bouchillon suggested asserting an insanity defense. *Id.* at 596. Based on these facts, we found that the attorney's representation was deficient.

Unlike in *Bouchillon*, here Simmons has presented no evidence that his counsel was on notice that Simmons suffered from PTSD or any other mental disorder, had been institutionalized, or was on medication. Accordingly, counsel's failure to investigate any mental defects or organic brain damage did not constitute deficient representation.

Finally, Simmons argues that counsel's performance was deficient because counsel failed to give the State the names of Simmons's mitigation witnesses until the second day of trial. Simmons fails to explain why this fact, even if accurate, constitutes deficient performance. To the contrary, such a delay could be considered a strategic decision to frustrate the State's efforts to prepare for cross-examination of these witnesses.

For all of these reasons, Simmons fails to satisfy the first prong of the *Strickland* test.

3.    Prejudice

To satisfy *Strickland*'s second prong, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Under this prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

17

Simmons does not persuade us that reasonable jurists could debate whether the Mississippi Supreme Court erred when it found there was no reasonable probability that the outcome of the trial would have been different absent counsel's supposed errors. Simmons argues that counsel should have presented additional mitigating evidence. However, much of the evidence that Simmons points to—Cunningham's affidavit, De Guy's affidavit, the statement of the hours worked by counsel, and the excerpt from the textbook—might support Simmons's argument that his counsel failed to investigate adequately, but says nothing about prejudice.

To the extent that Simmons's new evidence does go to prejudice, it is largely duplicative of evidence that was presented to the jury. In some cases, courts have found prejudice where attorneys presented basic facts to the jury but failed to develop those facts with important concrete details. For example, in *Neal* we found prejudice even though trial counsel presented "skeletal" mitigating evidence to the jury, which established that Neal "was moderately retarded, had been severely neglected by his family, spent several years in state institutions, and suffered from serious behavioral problems, including lack of self-control and sexual identity problems." *Neal*, 239 F.3d at 693. We reasoned that "with a more detailed and graphic description and a fuller understanding of Neal's pathetic life, a reasonable juror may have become convinced of Neal's reduced moral culpability." *Id.* at 694. The evidence in *Neal* provided "additional details" about "the terrible living conditions with [Neals's] alcoholic and abusive father," "the bleak, depressing, and hopeless life at the mental institutions," "Neal's abuse and mistreatment in prison and his general helplessness there," and "the level of Neal's retardation and his inability to control much of his behavior." It also helped to humanize Neal by providing the perspectives of "people along the way who saw some worth in him and befriended him." *Id.*

No. 08-70048

Unlike in *Neal*, here the additional evidence that Simmons presents does not provide a more robust understanding of Simmons's life. The only additional evidence of Simmons's childhood shows that his mother was a gambling addict who regularly left the children at home when she went to play bingo, that she had trouble paying her bills and paying for food, and that at least once Simmons's grandmother lent her money to pay her light bill. Especially considering the heinous nature of this brutal crime, we are not persuaded that this new evidence would have had any impact whatsoever.

The only other new evidence that Simmons presents is the newspaper article. This article shows that Simmons was troubled before the murder, but this article is only marginally relevant, and certainly is not sufficient to show prejudice. In fact, the article arguably shows that Simmons was anxious about the drug debt he owed to Wolfe. If this is the case, then the article might actually be harmful to Simmons, because it would support a finding of premeditation. Further, the article includes the allegation that Simmons tried to incite local teens to attack and kill African Americans, so counsel may have decided not to present it to the jury out of fear that it would do more harm than good.

Finally, Harris's statement that Lori possessed information valuable to Simmons's defense, seems to be nothing more than unfounded speculation. This statement has no impact on our determination.

Simmons fails to show that counsel's allegedly deficient performance was so serious that it deprived Simmons of a fair trial. Thus, Simmons fails to satisfy the second prong of the *Strickland* test.

**B.    Whether the Trial Court Erred by Precluding the Admission of Relevant Mitigating Evidence**

Simmons argues that the trial court erred by excluding the videotape at sentencing. At certain times during the sentencing phase of a capital trial, the

19

exclusion of evidence "constitute[s] a violation of the Due Process Clause of the Fourteenth Amendment" even when the evidence would otherwise be excluded under state evidentiary rules. *Green v. Georgia*, 442 U.S. 95, 97 (1979) (per curiam); *see also Eddings v. Oklahoma*, 455 U.S. 104, 111 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)) ("[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis omitted); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (holding that state evidentiary rules "may not be applied mechanistically to defeat the ends of justice").

Like the United States Supreme Court, the Mississippi Supreme Court has "recognized the qualitative difference between a death sentence and a sentence of life imprisonment." *Mackbee v. State*, 575 So. 2d 16, 39 (Miss. 1990). "Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Id.* (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)). In a capital case, "the jury must have before it as much information as possible when it makes its sentencing decision." *Id.* Therefore, "'Mississippi allows evidence of mitigating circumstance of an unlimited nature.'" *Id.* (quoting *Davis v. State,* 512 So. 2d 1291, 1293 (Miss. 1987)).

Despite the expansive language of *Green*, *Mackbee*, and related cases, we have repeatedly said that *Green* is "limited to its facts, and certainly did not federalize the law of evidence." *E.g., Barefoot v. Estelle*, 697 F.2d 593, 597 (5th Cir. 1983). Instead, *Green* stands for the proposition that in rare cases "certain egregious evidentiary errors may be redressed by the due process clause." *Id.* Accordingly, we must determine whether in this case the evidence is "highly

relevant to a critical issue in the punishment phase of the trial, and substantial reasons existed to assume its reliability." *Green*, 442 U.S. at 97.

It is clear that the videotape is highly relevant to a critical issue in the punishment phase of trial. It speaks directly to the issue of whether Simmons felt remorse for his crime—an issue that the prosecutor repeatedly brought up. Accordingly, we proceed to the second prong of the *Green* analysis: whether substantial reasons exist to assume the videotape's reliability.

In denying Simmons's request for post-conviction relief, the Mississippi Supreme Court expressed its concern that admitting the videotape might "throw open the door to obvious abuse." *Simmons*, 869 So. 2d at 1003. While we are sympathetic to the court's position, we conclude that in this case, reasonable jurists could debate whether substantial reasons exist to assume the videotape's reliability.

In *Green*, the Court considered: (1) whether the statement was made spontaneously to a close friend, (2) whether ample evidence corroborated the confession, (3) whether the statement was against interest, and (4) whether the State considered the testimony reliable. *Green*, 442 U.S. at 97. Here, there are indications that the videotape was made spontaneously. Although we do not know exactly how Simmons made the videotape—for example, whose camera he used, where he was when he recorded the videotape, or whether anyone helped him—we do know that he turned himself in the day after the murder. Thus, it seems that he recorded the videotape immediately after the murder. On the other hand, Simmons had to make a conscious decision to record the videotape, so the videotape was not as spontaneous as a statement made to a friend or a cellmate. The first factor tips in favor of reliability, although not as clearly as in *Green*.

Unlike in *Green*, here the videotape was made by Simmons rather than by another defendant. Therefore, the second factor—whether ample evidence

21

corroborated the confession—does not apply. As for the third factor, it is possible to argue that the videotape was a statement against interest, because Simmons made inculpatory comments. On the other hand, Simmons may have had ulterior motives to create the tape: he believed the police were hot on his trail, and he seemed to be trying to decide whether to turn himself in, run, or kill himself. Given his situation, it is possible that he knew he would be caught and wanted a jury to believe that he was remorseful. Of course, it is also possible that Simmons was simply trying to say goodbye to has family, express genuine remorse, and arrange for the proper disposal of his belongings. Accordingly, the third factor tips neither for nor against reliability.

As for the final factor, the State did not introduce the videotape at trial. However, the State did fight to be able to introduce it, and it seems likely that the State's choice not to introduce it was a tactical decision rather than a sign that the State questioned its authenticity. Thus, the State seemed to consider the videotape reliable. Accordingly, this factor weighs in favor of reliability, although not as clearly as in *Green*.

The videotape is highly relevant to a critical issue in the punishment phase of trial. In addition, the *Green* factors tip slightly in favor of reliability. Therefore, we find that reasonable jurists could debate whether the district court erred in finding that the Supreme Court of Mississippi reasonably applied federal law in determining that *Green* and related cases did not require the admission of the videotape at the mitigation stage.

## V. CONCLUSION

Reasonable jurists could not debate whether the district court erred in finding that the Supreme Court of Mississippi reasonably applied federal law in determining that Simmons's constitutional right to the effective assistance of counsel as defined in *Strickland* was not violated. Accordingly, we DENY Simmons's request for a COA on his ineffective assistance ground.

No. 08-70048

However, reasonable jurists could debate whether the district court erred in finding that the Supreme Court of Mississippi reasonably applied federal law in determining that *Green* and related cases did not require the admission of the videotape at sentencing.  Thus, we GRANT Simmons's request for a COA on this ground.  The Clerk's office will provide the parties with a briefing schedule.